[OCTOBER TERM, 1929]

## TIBBALS v. KEYS, ET AL.
(No. 1556; Oct. 17, 1929; 281 Pac. 190)

· The cause was submitted for the appellant on the brief of *John J. Spriggs* of Lander, Wyoming.

For the respondents, there was a brief by *A. H. Maxwell* of Lander, Wyoming, and *Wheaton Augur* of Chicago, Ill., and oral argument by *Mr. Augur* and *Mr. Maxwell.*

528

For the appellant *John J. Spriggs* submitted the following authorities in the reply brief.

Kimball, Justice.

The suit is by B. N. Tibbals, plaintiff, against Rollin W. Keys and others, as executors of the will of John C. Spry, deceased, defendants.

On July 28, 1900, Tibbals and Spry signed a writing which hereafter will be called the contract of 1900. The writing recites that Spry has heretofore been the owner of certain named mining claims which have become the property of the Federal Gold Mining Company, a corporation; that Spry, in working and developing said claims, "has employed Tibbals as manager at fifty dollars per month and also one-tenth of the net profits accruing from said mines after payment of the original cost of said mines and the expenses of working the same." The contract then prescribes the method for computing the original cost and expenses of working the claims, and provides that the amount so computed shall be "deducted from the sale when made and that balance then left shall be considered the net profits of which said Tibbals is to have and receive one-tenth, the payment of said one-tenth to be made to him in the same manner and at the same time as said Spry receives payment for his shares."

The mining claims were not sold, but some time between 1900 and March, 1904, a so-called "working option" to buy the property was given to Thomas Ewing. On March 1, 1904, plaintiff and Spry signed another writing which we shall call the contract of 1904. It follows:

"WHEREAS, John C. Spry of the City of Chicago, County of Cook and State of Illinois, and B. N. Tibbals, of South Pass City, Fremont County, Wyoming, have been engaged in various mining enterprises and especially the properties owned and controlled by the Federal Gold Mining Company, a corporation;

"AND WHEREAS the parties have this day made and accounted, one to the other, for the various expenses with relation to said property;

"AND WHEREAS said properties are now under contract to be sold to one Thomas Ewing, or his assigns or successors;

"NOW THEREFORE, For and in consideration of the sum of One Dollar and other good and valuable consideration, the receipt whereof is hereby acknowledged, paid by each party to the other, it is hereby mutually understood and agreed that the parties have this day agreed upon a full, complete and final adjustment of all matters appertaining to all mining or other interests, in which they are interested together, or in which either one of them owns and the other has any interest therein, or of the properties owned and controlled by the said Federal Gold Mining Company, a corporation organized under the laws of the State of Illinois, and also of the State of Wyoming, and that the said John C. Spry agrees to pay the said B. N. Tibbals and the said B. N. Tibbals agrees to accept the sum of $17,500, in full and complete satisfaction of all claims and demands of every kind and character which either of said parties may have against the other and of any and all interest in and to the properties, or any of them, owned and controlled by either of the parties hereto, or by the said Federal Gold Mining Company, it being understood that this is a complete and final and full satisfaction to date, all other contracts and agreements thereto, being hereby declared null and void and of no effect, said sum of $17,500, to be paid the said B. N. Tibbals, by said John C. Spry, as he receives his money from the said purchasers of·said properties.

"Said B. N. Tibbals to receive from said John C. Spry, said sum of $17,500, from the monies received by said Spry, for said properties, regardless of the price received by said Spry for said properties."

Mr. Spry having died and the defendants having become executors of his will, the plaintiff, on March 17, 1928, commenced this action. The amended petition contains four causes of action. The first and second are based on the contract of 1904.

The first cause of action, after setting forth the contract, alleges in substance that there is due the plaintiff the sum of $17,500, as provided in the contract; that no part there-

of has been paid him; that the property referred to in the contract was never sold by Spry, and asks that it be subjected to a lien in favor of the plaintiff to secure the amount due him, and that the property be sold to satisfy the claim.

The second cause of action is a demand for interest on the sum of $17,500 from the date of the contract, with prayer, as in the first cause of action, for a lien and sale of the property.

The third and fourth causes of action set forth in different ways a demand for a salary of $100 per month as manager of the mining properties from January 1, 1906, to the date of suit. The demand seems to be based on the contract of 1900 and subsequent alleged oral modifications of that contract, by which plaintiff claims it was agreed by him and Spry that plaintiff should receive a salary ($100 per month after March 1, 1904) as such manager. He alleges that the salary was paid until, but not after, January 1, 1906.

The answer to the first cause of action denies allegations not specifically admitted; admits the appointment of defendants as executors; denies information as to the contract of 1904, and admits that the properties mentioned in the contract, as alleged in the petition, were not sold by Spry. It is then alleged, "that the first cause of action is barred by the provisions of Section 5567, of Wyoming C. S. 1920," a plea which, standing alone, is probably defective under our holding in Fidelity & Guaranty Co. v. Parker, 20 Wyo. 29, 53, 121 Pac. 531. It is then pleaded:

"That whatever contract Thomas Ewing had with the late John C. Spry for the purchase of mining properties was terminated and annulled more than eighteen years ago, which the plaintiff knew or could and would with reasonable diligence have known about, and the cause of action, if any, stated did not accrue within ten years next before the commencement of this action."

The answer to the other causes of action need not be noticed at this time. The judgment was for defendants on all causes of action, and the plaintiff appeals.

We shall first discuss the questions arising under the first cause of action. At the trial, the defendants admitted the making by Spry of the contracts of 1900 and 1904. On the issues that arose under the first and second causes of action, the contract of 1900 is important only in so far as it throws some light on the meaning of the contract of 1904. The property referred to in those contracts consists of mining claims sometimes referred to as the properties of the Federal Gold Mining Company, a corporation, mentioned in both contracts. It is to be inferred from the evidence that that company was merely a paper corporation, created and controlled by Mr. Spry. It does not appear that the corporation ever had title to the property in question, and the mining claims, or most of them, on which plaintiff asks a lien, have been inventoried as property of the estate of Mr. Spry. The corporation is not a party to the action, and the executors apparently admit that the property referred to in the contracts of 1900 and 1904 belonged to Mr. Spry until his death, and is now a part of the estate in the hands of the defendants.

The facts material on the first cause of action are brief and practically undisputed. We have the contract itself; the failure of Mr. Spry to sell the property, and the failure of plaintiff to bring any action until after Mr. Spry's death. There is evidence showing that Mr. Spry was constantly trying to sell the property, and tending to show that he was holding it solely for that purpose. A great many letters from Spry to plaintiff, from 1904 to 1912, are in the evidence. Most of them have some reference to this property, and some of them tend to show that Mr. Spry recognized that plaintiff had some interest in the property or in the proceeds of a sale of it. None of them contains anything tending to show that Mr. Spry ever repudiated the contract

of 1904, or denied plaintiff's interest in the proceeds of sale of the property.

The plaintiff's rights under his first cause of action depend on the meaning and legal effect of the contract of 1904. The contract evidently was intended to make certain the amount due plaintiff on a settlement of his claim for expenses with relation to, and his interest in, certain mining properties which were then "under contract to be sold to Thomas Ewing." The plaintiff agreed to accept and Mr. Spry agreed to pay $17,500 in satisfaction of all plaintiff's claims and demands. The sum was to be paid by Spry from the moneys received by him for the properties, regardless of the sale price, and it was to be paid as Spry received his money from "said purchasers of said properties." Thus the parties to the writing not only fixed the amount to be paid plaintiff but undertook to prescribe the fund from which, and the time when, it should be paid.

The fund from which plaintiff was to be paid was "the moneys received by said Spry for said properties," as stated in the last paragraph of the writing. The parties clearly contemplated a sale by Spry, and that was the only means by which plaintiff could receive the benefit of his contract. The evidence shows pretty clearly that the property was always held for sale with little or no thought of operating it as a mine for profit. The defendants, however, relying on the recitation of the sale to Ewing, and the promise of Spry to pay as he received his money from "said" purchasers, argue that payment was to be made from moneys received from Ewing or his assigns, and not otherwise; and that, as it is admitted that Ewing abandoned his option, and paid nothing, nothing became due the plaintiff. This would be a very harsh construction, and one which we think the language of the writing does not require. See Williston on Contracts, Sec. 620. If it be conceded that the "said purchasers" referred to Ewing only, it would be apparent that Spry's promise to pay as he received his money from Ewing was a provision as to time of payment controlling

only in case the sale to Ewing was carried through. We think the fund from which plaintiff was to be paid was moneys received by Spry from Ewing or any other purchaser, in accordance with the meaning of the last paragraph. This construction is consistent with many expressions in letters by Spry to plaintiff, written long after the sale to Ewing had ceased to be thought of, showing that Spry was continuing to try to sell the property for the benefit of himself and plaintiff. Thus, in December 1906, about two years after the abandonment of the Ewing option, replying to a letter from plaintiff expressing unwillingness to go away if it would "null my contract with you in regard to this property," Mr. Spry wrote plaintiff: "I want to say this to you: that if you should go to Africa and come back and that mine was sold, I would do with you just as that contract calls for."

We think the contract contains no promise on the part of Spry to pay the sum of $17,500, except from the proceeds of the sale of the property, and when he received the purchase money. This would be clear, except for the provision whereby payment is to be made "regardless of the price received by said Spry for said properties." The plaintiff seems at times to contend that by that provision Spry would have been obligated to pay the full sum of $17,500, even in case the property sold for less than that amount. But that provision must be construed to harmonize with the other parts of the contract that show clearly an intention to pay only from the proceeds of a sale. When it was said that the sum should become due regardless of the price received, the parties were probably trying to make it clear that plaintiff's right should no longer be left indefinite, dependent on the amount received, as under the previous contract of 1900. Mr. Spry was agreeing to pay a definite amount, and cancelling a previous contract whereby he might have had to pay more based on a percentage of profit, but he was still stipulating that he should pay only from moneys received for the property.

So, by the contract of 1904, the plaintiff agreed to accept a definite amount from the proceeds of sale of the property in full satisfaction of sums claimed by him for services rendered in relation to the property and his interests in the property; and, in consideration thereof, Mr. Spry promised to pay to plaintiff the agreed sum out of the proceeds of sale, when received by Mr. Spry from the purchaser.

The plaintiff claims that the contract shows that Mr. Spry was trustee of an express trust. A trust, according to a definition approved by this court in Weltner v. Thurmond, 17 Wyo. 268, 294, 98 Pac. 590, 595, 99 Pac. 1128, 129 Am. St. Rep. 1113, is "an obligation upon a person arising out of a confidence reposed in him to apply property faithfully, and according to such confidence." Perry on Trusts, Sec. 2. "Any agreement or contract in writing made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such other person against the person making such agreement." Perry on Trusts, Sec. 82.

These principles were applied in Weltner v. Thurmond, supra. In that case the plaintiff, a mortgagor of real property, owing his mortgagees $4000, conveyed the mortgaged property to the mortgagees, the defendants. At the same time, the parties signed a writing which, after reciting that the property had been conveyed in payment of the mortgages, contained a stipulation that "in case said property sells for more than enough to pay off the claim of said first parties (the defendants), * * * then all sums of money over and above first parties' just and lawful claim is to be paid to said second party (the plaintiff)." It was held that the contract imposed on the defendants the duty to sell the property for the benefit of the plaintiff and defendants, and that the defendants became trustees of an express trust for that purpose.

The duty of Mr. Spry to sell must be implied as the duty of the grantees to sell was implied in Weltner v. Thurmond. When Mr. Spry, having the power of disposal over the property, agreed in satisfaction of plaintiff's claims to the property to sell it for plaintiff's benefit, it seems clear, under principles approved in Weltner v. Thurmond, and authorities there cited, that a court of equity should declare a trust in favor of the plaintiff as beneficiary.

The defendants contend that if, as we hold, the contract provides for payment only out of a fund to be obtained by sale of the property, and the fund has not come into existence, there can be no recovery on the first cause of action. This contention wholly overlooks plaintiff's equitable interest in the property, and is sufficiently answered by Weltner v. Thurmond, supra, and cases cited. One of the cases there cited and quoted from is Jones v. Kent, 80 N. Y. 585. Kent was sued as the administrator of one Rockwell who had bought corporate stock from plaintiff, paying therefor $3000, and promising to give him "one half of whatever price the same is sold for, when sold over and above that sum." Rockwell died without having sold the stock. The contract was held to import an obligation to sell, the court saying: "It does not in words say that the stock shall be sold, but as Jones can have the price or consideration of this transfer from no other source, it seems manifest that both parties understood that the event should at some time happen. (Citing cases). Thus only could the price be ascertained." The defendant urged that there could be no cause of action until a sale by Rockwell who had the right to determine when a sale should be made; that Jones trusted to Rockwell's judgment and discretion, and so long as he might exercise it, could not interfere. In other words, that a sale of the stock was a condition precedent to plaintiff's right to additional pay. The court, in answer to those contentions, similar to the contentions, as we understand them, of the defendants in the case at bar, said (Jones v. Kent, 80 N. Y. 589):

"It might be conceded that this inability on the part of Jones continued during the life of Rockwell, so that, if at any time, the stock went up Rockwell might think it would go higher and prefer to wait; that he might do so, and that Jones took this risk.

"It is not necessary to determine the soundness of this contention, for Rockwell is now dead, and the property unsold, and because it is no longer in his power to comply with the terms of his agreement and bring about the event, on the happening of which his promise was to be performed, is the plaintiff to lose the consideration for which he bargained, or the fruition of it be postponed until the representatives of Rockwell may in the course of administration deem it proper, or find it necessary to make a sale? or, that not occurring until the heirs or distributees of Rockwell's estate find it for their interest or pleasure to dispose of the stock and so fix a price? This would be unreasonable and might render it impossible for the plaintiff to avail himself of the advantage for which he contracted."

If we are right in our understanding of the contract of 1904, there can be no doubt under the cited authorities that the plaintiff's right in the property in the hands of Mr. Spry, ought now to be enforced against the same property in the hands of the defendants, unless the right has been lost by laches or the operation of the statute of limitations. And the defendants contend that it has been so lost.

The defense, according to the answer, is that the plaintiff's right of action accrued when the plaintiff had knowledge that Ewing refused to exercise his option to buy the property. We think that contention is shown to be without merit by what we have already said in regard to the fund from which the money was to be paid. The failure of Spry to sell to Ewing was not, in our opinion, a breach by Spry of the contract; nor did it terminate the contract between plaintiff and Spry. But the defendants raise a more serious question by contending that Mr. Spry's duty was to sell the property in a reasonable time, and that such reasonable time expired more than ten years before the commencement of the action, and is barred both by statute and on

the principle of laches. The plaintiff insists that this defense was not pleaded, and it may be that he is right, but we do not need to put our decision on that ground.

As stated in Weltner v. Thurmond, supra, at p. 306 of 17 Wyo., 98 Pac. 590, 99 Pac. 1128, 129 Am. St. Rep. 1113, the statute of limitations does not begin to run in cases of express and continuing trusts until repudiation or adverse possession by the trustee. The defendants have not alleged, and there is no evidence to show, either repudiation or adverse possession by Mr. Spry. The only possible contention open to the defendants is that Mr. Spry repudiated his contract by failing to sell the property in a reasonable time, which expired ten years or more before the commencement of the action. If they hoped to succeed on that theory they should have introduced some evidence to show what was a reasonable time. They did not do this. The question as to what was a reasonable time, if it entered into the case at all, was one of fact to be decided in the light of the circumstances. The evidence outside the contract itself tends to show that both Spry and plaintiff acted on the theory that the time of sale was within the discretion of Mr. Spry, who was always holding the property for sale, but apparently never able to sell for what he considered an adequate price. The property was of speculative value. While sales for large amounts were frequently talked about, there is no evidence from which it could be held that Spry at any time could have sold it for a price equal to the amount that both he and plaintiff thought it was worth. We know of no rule of law that prevents one party to a contract from giving to the other a long time for performance. See, Link v. Hill, 117 Ohio St. 421, 159 N. E. 573. In the case at bar there would be no justification for holding that Spry repudiated the trust relation, or assumed any hostile or adverse possession of the property, by failing to sell it during his lifetime.

The judgment for defendants on the second, third and fourth causes of action was clearly right. Much of plain-

tiff's brief is taken up with criticism of defendants' answer to these three causes of action, but there can be no doubt that the answer contains a general denial of the allegations of each. We are of opinion that plaintiff failed in his proof on each, and it will be unnecessary to determine whether some defenses were defectively pleaded.

We find nothing in the evidence or in the cited authorities to support plaintiff's claim to interest as set forth in his second cause of action. The contract says nothing about interest, and the money was not payable until the property was sold. There is no evidence to require a finding that Mr. Spry should have sold the property at or within any particular time, and if the plaintiff had proved that the money became due at the time from which he claims interest, he would have considerable difficulty in escaping the charge of laches.

In the third and fourth causes of action, the plaintiff relies on a contract which he failed to prove. If anything was due plaintiff for his salary as manager of the mine prior to March, 1904, it was evidently settled by the contract set forth in his first cause of action. This he admits. But he seems to claim that there were other oral contracts by which he was continued as manager for a definite salary. He did not prove any such contract. The defendants' evidence was ample to warrant a finding that plaintiff performed no services as manager of the property after 1906, and plaintiff's evidence showed that he received several payments of $50 each from Mr. Spry during 1906. If it be conceded that plaintiff acted as manager of the property from March, 1904, until January, 1907, or even beyond that time, he could not expect to recover without proving either a contract or facts to support a judgment on a *quantum meruit*. He alleged a contract that he failed to prove, and neither by allegations nor proof made any claim on a *quantum meruit*.

The judgment of the trial court on the second, third and fourth causes of action will be affirmed. The judgment on the first cause of action will be reversed. A new trial of that cause of action will not be necessary. It may be that the trial judge may be of opinion that the record contains no sufficient description of the property in question. If so, and the parties cannot agree on the description, evidence may be taken on that point. The case will be remanded with direction to enter in favor of plaintiff a judgment on the first cause of action that will declare his right in the property in accordance with the views above expressed, with appropriate provisions for sale of the property, if necessary, to satisfy plaintiff's claim of $17,500, or so much thereof as can be realized from the sale. Out of the proceeds of the sale, the costs and expenses of sale should first be paid. The remainder up to the sum of $17,500 should be paid to plaintiff, and the rest to defendants. If the property sell for less than enough to satisfy costs and expenses of sale and plaintiff's claim, he shall be entitled to no judgment for the difference. There should be no general judgment against the defendants except for plaintiff's costs in the District Court. Each party will pay his costs in this court. Details not covered by what we have said are left to the discretion of the trial judge.

*Affirmed in part, reversed in part with directions.*

BLUME, Ch. J., and RINER, J., concur.