## DALLAS DOME WYOMING OIL FIELDS CO. v. BROODER

(No. 2122; December 12, 1939; 97 Pac. (2d) 311)

114

For the plaintiff in error, there was a brief by *A. H. Maxwell* of Lander, *E. E. Enterline* and *Madge Enterline* of Casper; *Chas. J. Mackenzie* of counsel, and oral argument by *Messrs. Maxwell* and *Enterline*.

For the defendant in error, there was a brief by *C. J. Christie* and *L. A. Crofts* of Lander, and oral argument by *Messrs. Christie* and *Crofts*.

120

122

BLUME, J. (after reciting the foregoing statement of facts).

1. Defendant contends that the various extensions of the indebtedness were necessary, and were beneficial to the deceased; that it had the right to take the property back when the purchaser defaulted, without being responsible to the deceased therefor; that the agreement to pay a commission is a limited one, and it is liable only for the commission on the amount actually collected, namely, for five per cent of $153,751.08, resulting in a liability of $7,687.55 and nothing more. There can, of course, be no doubt that where parties make a special contract, limiting the duty to pay a commission to certain events, the contract will govern. Owens v. Tel. & Tel. Co., 50 Wyo. 331, 343, 68 P. (2d) 1006; Murphy v. Livestock Co., 26 Wyo. 455, 474, 187 Pac. 187, 189 Pac. 857, 20 A. L. R. 290; 12 C. J. S. 228-230; note 51 A. L. R. 1399 et seq. In Larson v. Burroughs, 131 App. Div. 877, 116 N. Y. S. 358, it is held that "to entitle a real estate broker to commissions under an agreement to pay the same when the balance of the cash amount was paid, and the deed delivered, he must show either that the balance has been paid and the deed delivered, or that non-performance was the fault of the owner." The agreement in the case at bar provides that the commission shall be due only as and when the installments on the purchase price are paid.

The only amount paid on the installments is $153,751.08 (aside from 25,000 shares of stock), and the liability of defendant is limited to the payment of a commission on the amount paid unless special circumstances herein make a different rule applicable. The plaintiff contends that the agreement to pay a commission constitutes an express trust, and "that it was the duty of the defendant to collect the money for the benefit of the plaintiff and to hold it and pay it back to him." Tibbals v. Keys, 40 Wyo. 535, 281 Pac. 190, and Weltner v. Thurmond, 17 Wyo. 306, 99 Pac. 1128, are cited, but these cases do not seem to have any bearing herein. The agreement herein constitutes either a broker's contract for commission or a trust. In the former case, the defendant became merely a debtor when sums were collected; in the latter, the deceased had an interest in the notes given to the defendant or the proceeds thereof. While the owner of property may constitute himself as trustee (65 C. J. 277-278, 311), it is said that "in general at least, no trust is created where the transaction is as consistent with another type of transaction as with that of a trust." 65 C. J. 280; see also 65 C. J. 305, 306. It is stated in 26 R. C. L. 1168 that an express trust "in its simplest elements, is a confidence reposed in one person who is termed trustee, for the benefit of another who is called the cestui que trust (or beneficiary) respecting property which is held by the trustee for the benefit of the cestui que trust." See also 65 C. J. 212, 218. It is essential, then, that there be a trust estate—property in which the beneficiary has an interest. 26 R. C. L. 1179, 1183; 65 C. J. 218. Hence, if the agreement in the case at bar may be said to constitute a trust, we must be able to gather from its terms that the deceased had an interest in the notes or the proceeds thereof. The agreement states that the deceased "shall be paid a commission of five per cent of the agreed sale price * * * such commission to be payable

* * * by this company as and when the several instalments * * * are received by this company." It fails to state that the deceased had an interest in the notes given or the proceeds or even that the five per cent should be paid out of the sums received by the company, but that it should be paid by the company. The agreement seems, accordingly, to constitute the company merely a debtor when the sums due on the purchase price were paid. The point, however, whether that is true or whether the deceased had an interest in the notes or the proceeds therefrom is, in view of the facts, of no importance herein. The only point which is important, if a trust was created, is as to what were the duties of the defendant. It is stated in 65 C. J. 663, that "the liability which devolves on a trustee by reason of his accepting the trust may be limited by the terms of the trust instrument, and where the liability of the trustee is (so) limited * * * the general rules of law are not applicable." And in 65 C. J. 647, it is stated that "by accepting the trust, a trustee becomes bound to execute it in accordance with the provisions of the trust instrument." Pomeroy on Equity (4th ed.) Sec. 1062 states that "the trust itself whatever it may be, constitutes the charter of the trustee's powers and duties; from it he derives the rule of his conduct; it prescribes the extent and limits of his authority; it furnishes the measure of his obligations. If the trust is express, created by deed or will, then the provisions of the instrument must be followed and obeyed." Hence the agreement for the payment of commission involved herein, even if construed as an express trust, is, like any other agreement, controlled and limited by its terms; it did not enlarge the rights of the beneficiary beyond what was granted and contemplated therein, and it did not destroy or diminish the rights of the defendant which were reserved to it therein or which were contemplated or granted to it thereby. What,

then, under the agreement involved herein, were the duties of the defendant, if it is to be considered as a trustee? We should say, that it was its duty to pay over the money belonging to the deceased as equitable owner; to act in good faith, and do nothing contrary to the terms of the agreement to deprive the deceased of his commission. That does not amount to much more than what is indicated in Larson v. Burroughs, supra, that the non-fulfillment of the contract of purchase must not be due to the fault of the owner. It is a general rule, applicable universally, and not in trusts alone, that "a party to a contract cannot take advantage of his own act or omission to escape liability thereon." 13 C. J. 647. And a broker, too, the same as a trustee, must act in good faith (8 Am. Jur. 1066) though, of course, the latter's duty may be greater than that of the former. If there was any other duty upon the defendant, considered as trustee, than that above indicated, it was to collect, if possible, the installments due under the contract of purchase. That contract, however, referred to in the agreement for commission, prevented the defendant from bringing any suit for collection. Hence there was little which the defendant could do, or could be forced to do, in that connection. Moreover, the contract of purchase gave the defendant the right to recapture the property at any time upon default in the indebtedness. That seems to be inconsistent with the duty of the defendant to take any steps to enforce the payment of the installments due. Counsel for the plaintiff seem to take the position that the defendant, as trustee, was bound to collect the money; that it was an insurer in that respect. Not only is that wholly inconsistent with the agreement, as already stated, but we find no rule or principle of law which enforces any such drastic duty. It is stated in 65 C. J. 819 that as a "general rule, so long as trustees * * * exercise reasonable prudence, care and diligence, they

cannot be made responsible for any loss * * * and they are not liable for mere errors of judgment, when acting honestly with ordinary prudence within the limits of the trust." In 26 R. C. L. 1280, it is stated that "the duty of a trustee is to perform the trust he has undertaken according to the provisions of, and in the manner directed by the deed of trust, and as a general rule the measure of care and diligence required of a trustee is such as would be pursued by a man of ordinary prudence and skill in the management of his own estate. A trustee is not an insurer." In Pomeroy's Equity, supra, Sec. 1070, it is stated that "the law does not cast upon the trustee an extraordinary duty, nor demand an extraordinary care, nor hold him liable for mere error of judgment, much less does it make him an insurer of the property." That the defendant did not fail in its duty to make all reasonable efforts to collect the installments due on the purchase price, if there was any such duty, becomes apparent from an examination of the evidence submitted in this case. It tried to collect; it made every effort possible; the purchaser was unable to pay; the only thing that the defendant could do was to grant extensions from time to time. Counsel for the plaintiff argue that the extensions were granted without the consent of the deceased, and that hence the payments due the latter were accelerated, and all became due. There are two answers to this. In the first place, if the defendant was a trustee, it held the legal title to the purchase-money notes. It, as trustee, had a perfect right to do any and all reasonable things in its discretion to collect the money without the consent of the deceased. 65 C. J. 645, 678. In the second place, the extensions were not a detriment to the deceased. On the contrary, they were a distinct benefit, since most of the commissions which accrued in his favor were collected under the extensions. It would seem to be clear that plaintiff cannot,

under these facts, complain, and it has been so held. Price v. Selby Smelting and Land Co., 35 Cal. App. 684, 170 Pac. 1075; Seymour v. St. Luke's Hospital, 28 App. Div. 125, 50 N. Y. S. 989; appeal dismissed 159 N. Y. 524, 53 N. E. 1132.

2. Counsel for plaintiff contend that the purchase price of $500,000 was fully paid by reason of the fact that the property was finally re-conveyed to the defendant. Two different lines of argument are advanced in that connection. (a) In the first place, attention is called to the fact that while the agreement for commission states that Brooder should have a commission of five per cent on the purchase price of $500,000, payable according to the letter of May 23rd, 1930, notifying the defendant of the exercise of the option to purchase the property, the last clause of the contract provides for "such commission to be payable to you by this company as and when the several installments on account of the purchase consideration are received by this company." Counsel argue that here a distinction has been made between the "purchase price" and the "purchase consideration," the first clause above mentioned using the former term, the last clause the latter. They contend, if we understand them correctly, that inasmuch as the letter of notification above referred to contained the provision that in the event of any default in the payment of any of the principal or interest of any of the installments, the defendant would look to the mortgaged property in satisfaction of the amount due, the "purchase consideration" consisted of $500,000, satisfied either by the payment of the installments due, or by the defendant taking the property back, in default thereof. We are unable to find any merit in this contention. If the commission was to be paid in either event, it was useless to give the deceased any paper writing other than an absolute agreement to pay him $25,000. The terms "purchase price" and

"purchase consideration" refer, we think, to the same thing and were used synonymously.

(b) The testimony in this case shows that the defendant recaptured the property on December 14, 1935, pursuant to its right to do so by reason of the default of the purchaser, and in order to save the cost of foreclosure. Counsel for the plaintiff contend that the testimony does not present the true state of facts, but that on the contrary, the property was reconveyed to the defendant pursuant to a written contract of December 14, 1930, between the defendant and the purchaser, and that this agreement shows that the defendant desired to repurchase it, and the whole of the purchase money of $500,000 heretofore mentioned must be considered to have been paid. The contract just mentioned recites the various agreements and modifications entered into prior to that date, and then recites that "whereas the parties hereto are desirous to enter into a new agreement in place and stead of said terminated agreement of May 23, 1930, as amended and extended as aforesaid, now therefore" the purchaser is released from all liability on the agreements theretofore made; the property shall be reconveyed to the defendant; the purchaser shall have to Dec. 1, 1936, to operate the property as theretofore, and during that time shall have the right to repurchase the property for $460,000. The conveyance to the defendant was made, and the right to repurchase the property was cancelled by mutual agreement on December 1, 1936.

The release from personal liability above mentioned is of no significance herein, since it was merely in accordance with the letter of May 23rd, 1930, under which the deceased was entitled to a commission. The agreement to reconvey, too, merely confirms that letter, in which it was provided that the purchaser would reconvey the property upon default. Default had long

existed. There was in fact nothing new in the agreement of December 14, 1935, except the right given to continue operating the property till December 1st, 1936, and the option to repurchase it during that time. The deceased was entitled to a commission only under the contract of May 23rd, 1930. The payment thereof was conditional upon the fulfillment of that contract, and subject to the terms giving the right to terminate the contract and take a reconveyance. These conditions were, as already stated, binding upon the deceased. There is nothing in the contract of Dec. 14, 1935, so far as we can see which is in any way in conflict with the testimony in the case. The contract merely states that the parties desire to enter into a new contract. The reasons for that are not stated. To find it, we must resort to the testimony and to the surrounding circumstances. By doing so, we find that the purchaser was unable to comply with the terms of purchase, and that the parties desired to avoid the expense of foreclosure—to go into court to enforce re-conveyance. It has been held that for a former owner to bid in the property at a foreclosure or other judicial sale is not equivalent to payment of the purchase price thereof by the vendee. Margolis v. Trust & Sav. Bank, 122 Cal. App. 186, 9 P. (2d) 526; Cannon v. Selsmer, 85 Cal. App. 783, 260 Pac. 332; Roach v. McDonald, 187 Ala. 64, 65 So. 823; North Sea Development Co. v. Burnett, 254 N. Y. 374, 173 N. E. 628; Stockton v. Lenois, 198 N. C. 148, 150 S. E. 886; Denny v. Hogue, 265 Ky. 30, 95 S. W. (2d) 1124. The same is true if the vendor merely cancels, or consents to the cancellation of a contract of sale, after, and because of the purchaser's default. It is stated in 12 C. J. S. 200 that "after a contract between the principal and a customer produced by the broker has been concluded its subsequent modification or cancellation does not defeat or affect the right of the broker to a commission,

unless it is done at his request or with his consent." That statement might be misleading, if not read in connection with other portions of the text. It applies only if the broker is already entitled to his commission at the time or previous to the time when a contract of sale is entered into between the vendor and vendee. It does not apply when the commission is conditional, as, for instance, upon the payment of the purchase price. In such case cancellation by reason of the default of the purchaser is not equivalent to payment. That is abundantly attested by the authorities, some of which we cite: 12 C. J. S. 230; 8 Am. Jur. 1096, 1097; Murray v. Rickard, 103 Va. 132, 48 S. E. 871; Trimue v. McCaleb, 172 Ark. 137, 287 S. W. 740; Boysen v. Frink, 80 Ark. 254, 96 S. W. 1056; McPhail v. Buell, 87 Cal. 115, 25 Pac. 266; Seymour v. St. Luke's Hospital, supra; Dunne v. Colomb, 192 Cal. 740, 221 Pac. 912; Ash v. Oppman, 199 Ill. App. 578; Baker v. Brewer's Estate, 78 Ind. App. 573, 133 N. E. 397; Van Norman v. Fitchette, 100 Minn. 145, 110 N. W. 851; Seagal v. Highs, Inc., 96 F. (2d) 208. If that is true, it must be equally true when a contract is cancelled and reconveyance is made in order to save the cost of foreclosure. In fact, as already stated, the reconveyance was specifically provided for in the agreement of May 23rd, 1930. The contention, accordingly, now under consideration, must be overruled.

(c) We cannot, then, conceive of any theory upon which the judgment of the trial court can be upheld. The court perhaps thought that, despite the fact that the defendant was entitled to a reconveyance, it did not act in good faith, for that such good faith is required has already been mentioned. Of course, if there had been a collusion between the defendant and the purchaser to reconvey for the purpose of defeating the commission, or, perhaps, if the defendant had recklessly and wilfully insisted upon a technical default,

whereas by a little indulgence the installment due from the purchaser would have been paid, a different situation would be before us. But no such claim can be, or is made. The defendant was patient, extended the time for payment of the installments a number of times, and in every way indicated that it meant to live up to its part of the contract. How much longer than five years' time (for it was nearly that) was the defendant required to wait before demanding a reconveyance? We think it was patient enough. We have been unable to find anything in the record before us which reeks of bad faith. The contention that the defendant wanted to repurchase the property, and that the reconveyance was made for that reason, is not very plausible. The fact that an option was given to resell it seems alone to contradict it. True, some improvements had been made on the property by the purchaser. The value thereof does not appear in the record. But it may be pointed out that the annual interest on the purchase price of $500,000 was $30,000, and even when reduced to approximately $350,000 was about $21,000, so that the total accumulated interest up to December 14, 1935, must have been over $75,000. Furthermore, the oil was being continually depleted. Most of the money paid on the purchase price was paid out of the property, and we have no reason to doubt the testimony that on the last mentioned date, the property was not worth over fifty per cent of the value on May 23, 1930. The testimony bearing on the good faith of the parties was all introduced by the defendant herein. It shows that the failure to pay the purchase price in full, was not in any way due to fault of the defendant, but was due to the economic depression. The testimony is undisputed. There is nothing in the record to indicate that it should be disregarded. It is fully corroborated by facts of which we take judicial notice and by facts shown in public and semi-public documents. We take

judicial notice that a severe economic and financial depression commenced in the latter part of 1929 which lasted up to the time when the reconveyance herein, in December, 1935, was made. Martin v. Louisville Motors, 276 Ky. 696, 125 S. W. (2d) 241; Weaver v. Greenbaum, (Cal. App.) 87 P. (2d) 406; In re Bose's Estate, (Nebr.) 285 N. W. 319; In re West's Estate, 285 N. W. 565; Federal Land Bank v. Garrison, (S. C.) 193 S. E. 394; Ohio Bell Tel. Co. v. Public Ut. Comm., 57 Sup. Ct. 724. Many other authorities could be added. The financial and economic debacle is portrayed by dry but eloquent figures. As illustration, we may mention the course of prices per share of the common stock of a few of the leading industrial companies, stating, in order not to give too many figures, the highest price in 1929 and the lowest in each of the years of 1931, 1932 and 1935. They are as follows: General Motors, 91, 21, 8, 27; Dupont, 231, .50, 22, 86; General Foods, 81, 28, 19, 30; United States Steel, 261, 36, 21, 27; United States Rubber, 65, 4, 1½, 9½; General Electric, 168, 22, 8, 20; Westinghouse, 292, 22, 15, 32; Ford Motors of Canada B, 172, 13, 8, 25; National Dairy Products, 86, 20, 14, 12; Anaconda Copper, 174, 9, 3, 8. (Moody's Manual, 1936.) The average prices in comparative percentages of industrial stocks was, in the years mentioned, 381, 76, 41, 100; of utility stocks, 144, 16, 20, 14; of railroad stocks, 189, 32, 13, 28. (Poor's, Dec. 11, 1937.) A great many, if not the great majority of real estate bonds in cities defaulted, commencing with 1931, or as early as the latter part of 1930. According to a document issued by the Department of Public Relations of the American Petroleum Institute in 1937, p. 96, the average price per barrel of oil produced in Wyoming was $1.28 in 1929, and in the following years up to and including 1935 respectively as follows: $1.25, .75, .82, .59, .84, .85. If we may credit the leading trade journal relating to oil in

this state, on file in the Library of the State, namely, the Inland Oil Index, the prices per barrel, posted in the field, of oil in Fremont County was as follows (the different prices given at any one date being the prices of different companies) : January, 1929, 80 cents; March 5, 1931, 40 cents; July, 1931, 65 and 35 cents; November, 1931, 65 and 45.5 cents; December, 1932, 65, 45 and 35 cents; January, 1933, 45, 45 and 30 cents; September, 1933, 45 cents; December 27, 1935, 45 and 57 cents. It is hardly necessary to call attention to the fact, commonly known, that from 10 to 12 million men or more were out of employment in the United States during the years here mentioned. In view of the painful facts here related, it is altogether unlikely that the purchaser was exempt from the depression, and they make it highly probable that the testimony of good faith related by the witnesses is true. The deceased and his successors in interest must, accordingly, be held to be entitled to a commission only on the amounts actually paid in cash, excepting the value of stock turned over to the defendant, which we shall consider later.

3. The deceased during his lifetime acknowledged in writing that he owed the defendant the sum of $9,424.80. That is not disputed herein. No claim for this was ever presented to the administrator of the deceased, and counsel for the plaintiff contend that this was necessary, in order that an allowance to the defendant can be made for that amount. We are cited to Vol. 3, p. 1377, Bancroft's Probate Practice, where it appears that the authorities on the point are in hopeless conflict. See also 24 C. J. 760; American Digest, Executors and Administrators 434(5). In some states, as for example in Nebraska and Vermont, special statutes provide that no counterclaim can be set up in a suit by the executor or administrator of an estate, unless such counterclaim has been presented.

Section 88-3109, Rev. St. 1931, provides that "no holder of any claim against an estate shall maintain an action thereon unless the claim is first presented to the executor or administrator." Section 88-3103 provides that "all claims whether the same be due, not due, or contingent, must be filed or exhibited within the time limited in the notice and any claim not so filed or exhibited is barred forever." In commenting on that section in Delfelder v. Land Co., 46 Wyo. 142, 168, 24 P. (2d) 702, we stated that the term "barred" is a technical term and is applied to actions or suits; in other words, refers to the same things as section 88-3109, supra. Section 88-3107 provides that if a claim is rejected, suit must be brought thereon within three months, or otherwise be forever barred. If the claim, then, is presented and rejected, the defendant is required to bring suit. The administrator would not be required to set up his claim, and thus two suits might result.

There is good authority holding that these special statutes of limitation do not apply to a counterclaim filed in an action brought by an executor or administrator. Church on Probate Law and Practice, vol. 2, p. 174, states that "in a suit by an administrator a defendant having a set-off may plead and prove the same without showing that it has been presented as a claim against the estate, and this notwithstanding the amount of the set-off exceeds the sum sued for, though in such case no judgment for the surplus should be rendered against the estate." Wood on Limitations (4th ed.) Sec. 188, seems to take the same view, and that author's statement was expressly approved in the case of Ware v. Howley, 68 Iowa 633, 27 N. W. 789. In Stiles v. Smith, 55 Mo. 363, the court, in speaking of statutes like those above mentioned stated:

"The statute applies to and contemplates cases where the creditor is the actor, and himself moves in the

matter of getting the allowance. There he must proceed within a certain time or be forever barred. But a person may well have a demand against an estate, and knowing that he is also indebted to the estate, neglects to prove up the same supposing that the amounts are about equal, and that when he is proceeded against, he can plead his demand as a set-off and thus determine the whole matter in one suit."

In other words, in a case of that kind, the person really makes no claim, at least an affirmative claim, against the estate, and so has nothing to present; he merely takes the position that, if sued, he will show that, on a balance, he owes nothing to the estate, or only a remainder. It has been held, even under a statute expressly forbidding counterclaim to be set up in an action by an executor or administrator unless previously presented to him, that the claim of payment need not be presented in the estate. Parker v. Wells, 68 Nebr. 647, 94 N. W. 717. See also Printy v. Fahill, 235 Ill. 534. The practical situation in the case of a payment and in the case of a set-off or counterclaim is very much the same. In both cases the executor or administrator may not know the amount thereof, until he sues. In both cases the burden of proof rests upon the party relying thereon. So that the query obtrudes itself upon the mind as to whether the slight difference which may exist between the two situations justifies the application of a different rule in the one case from that applied in the other. The case at bar presents a good illustration. The acknowledgment of the debt by the deceased states that "I authorize the amount charged against my balance as per Mr. Campbell M. Hunter's letter of July 14, 1930." It would seem, accordingly, that the amount so acknowledged may just as well be treated as a payment as a counterclaim. However that may be, it was stated long ago, in 1768, by Lord Mansfield, that "natural equity says that cross-

demands should compensate each other, by deducting the less sum from the greater, and that the difference is the only sum which can be justly due." Green v. Farmer, 4 Burr. 2214, 98 Engl. Repr. 154. See also Berrigan v. Pearsoll, 46 Conn. 274. It would seem that this principle of natural equity has been embodied in our statute, making it a rule of law as well. Section 89-1022, Rev. St. 1931, provides:

> "When cross-demands have existed between persons under such circumstances that if one had brought an action against the other, a counterclaim or set-off could have been set up, neither can be deprived of the benefit thereof by assignment by the other, or by his death, but the two demands must be deemed compensated so far as they equal each other."

According to Webster's International Dictionary, the term "compensated" means "extinguished" or "satisfied" according to the civil law, and it was so understood by Lord Mansfield, supra. That is evidently the meaning here. If a debt is deemed extinguished when one of the parties dies—in this case the debt of the defendant to the extent of $9,424.80—the principle of contradiction in logic tells us that it cannot at the same time be considered existing. No debt, to that extent, remains. It is paid. An identical statute was construed in the case of Murphy v. Colton, 4 Okl. 181, 44 Pac. 208, and that, too, in the light of the same provisions of the Probate Code as are found in our statute, and the court stated:

> "It is true the Coltons did, in this case, claim a balance in their favor, but they did not recover any balance. They have therefore maintained no action upon any claim against the estate, but have simply presented proof that they did not owe the estate the amount claimed, because they had a just set-off to the claim of the estate. Suppose McKennon had never furnished for the Coltons' benefit any money beyond the $250,

and that the Coltons had a just account against McKennon to the full amount of this $250 and accruing interest, and they had never had any settlement. In such case, of course, their claims would be evenly balanced, and neither would be a debtor. Suppose the Coltons, considering the accounts were even, should have let the matter rest in that way, as the parties no doubt would have done had McKennon lived, and the time for presenting claims against the estate had expired, and the estate had then sued the Coltons on the note. Could it be claimed that under these statutes they could not show that the note was in fact settled by the account of McKennon due to them, and that it in fact had been settled long before McKennon's death? Such a position would be absurd, as well as absolutely untenable, not only in the face of these statutes, which would protect rather than injure the Coltons, but without them."

A statute identical with ours was also construed in Huffman v. Wyrick, 5 Ind. App. 183. The Probate Code of Indiana provides, like ours, that unless a claim is presented in the estate it shall be barred. The court stated:

"This statute gives the right to the holder of any such claim to treat it as having liquidated an equal amount of the other claim upon the death of the holder of the latter. No one would question the right of the appellee, if he had actually paid the notes to the decedent during her life-time, to plead such payment in this action; and the statute above quoted gave him the right to treat the notes as paid by his claim upon the death of the decedent. We think there is no question about his right to plead and prove such constructive payment after the settlement of the estate. He was not entitled to judgment for the excess of his claim, and the court did not give him such judgment."

Section 440 of the Code of Civil Procedure of California is like our section 89-1022, supra. In a number of decisions in that state it was held, without considering that section, that a counterclaim can not be set

up in an action by an executor or administrator, unless previously presented to him. Later, Sec. 440, supra, was called to the court's attention, namely, in Reveal v. Stell, 56 Cal. App. 463, 205 Pac. 875, where the court stated:

"While under Section 440, Code of Civil Procedure, the right to plead a cross-demand against the estate of the deceased person is not affected by his death, nevertheless such right, we think, under our Code, is subject to a compliance with the law requiring the presentation of such claim to the executor or administrator of the estate of the deceased."

The court doubtless was influenced by previous decisions in that state. Section 440 deserved a somewhat more careful consideration than was given it.

If a counterclaim must be presented at all events, the provisions of section 89-1022, supra, would seem to be of little, if any, value. If such claim is filed and proved, either by allowance by the executor or administrator, or by the court, then by that fact alone the benefit of the claim is preserved to the claimant, and there would be little use for a special statute providing therefor. Several states have a special statute providing that a defendant may set off a debt in an action brought by an executor or administrator, without stating whether the claim must be presented or not. The effect of such statutes seems to be substantially the same as the effect of section 89-1022, supra. It has been uniformly held under such statutes that the claim need not be first presented. Fishburne v. Bank, 42 Wash. 473, 85 Pac. 38, 7 Ann. Cas. 848; McDonald v. McDonald, 119 Wash. 396, 206 Pac. 23; Browning v. Eiken, 189 Minn. 375, 249 N. W. 573 and cases cited; Jester v. Knotts, (Del.) 57 Atl. 1094. We think, accordingly, that the court was right in allowing the set-off, to the extent of offsetting the claim of plaintiff.

Defendant claimed a set-off of an additional amount, but it is unnecessary to consider it.

4. We find, then, that the defendant is liable for five per cent commission on $153,751.08, or a total of $7,687.55. It also received 25,000 shares of the stock of the purchaser, which has a par value of $1.00 each. The plaintiff did not introduce any evidence of its value, and in fact objected to evidence introduced by the defendant. It is held in some cases that in the absence of evidence, the par value of the stock will be considered its value. Appeal of Harris, 9 Pa. Cas. 233, 12 Atl. 743; Tevis v. Ryan, 13 Ariz. 120, 108 Pac. 461, 465; Uncle Sam Oil Co. v. Forrester, 79 Kans. 610, 100 Pac. 512; Walker v. Bement, 50 Ind. App. 645, 94 N. E. 339, and a number of Missouri cases, including Williams v. Everett, (Mo.) 200 S. W. 1049; Brinkerhoff Sav. Co. v. Lumber Co., 1118 Mo. 447, 24 S. W. 129. The contrary is held in Virginia v. West Virginia, 238 U. S. 202, 219, 35 Sup. Ct. 795, 802, 803; Beatty v. Johnson, 66 Ark. 529, 52 S. W. 129; Warren v. Stineman, 84 App. Div. 610, 82 N. Y. S. 1003; see also Brandt v. Buckly, 27 Ga. 515, 109 S. E. 692; Barnes v. Brown, 130 N. Y. 372, 29 N. E. 760; 14 C. J. 718; Castle v. Ice Cream Co., 101 Cal. App. 94, 279 Pac. 1011, 281 Pac. 396. The defendant apparently contended in the court below and contends here that the stock was of no value. Its allegation in its answer filed herein seems, however, inconsistent therewith, for therein it is stated that "said stock as a matter of fact had no market value or real value at that time in excess of its par value." That seems to be an admission that the stock had a value to that extent, namely a value of $25,000. The point seems to be of no importance herein. If five per cent commission be allowed on $25,000, namely, the sum of $1250, and added to the sum of

$7,687,55 above mentioned, it would make only a total sum of $8,937.55. Plaintiff has a set-off of $9,424.80, so that nothing remains due to the plaintiff. It follows, accordingly, that the judgment of the trial court must be reversed, with direction to dismiss plaintiff's petition herein. It is so ordered.

*Reversed, with direction.*

RINER, Ch. J., and KIMBALL, J., concur.