SCOTTI'S DRIVE IN RESTAURANTS,
INC., Appellant (Defendant below),

Scotti's Drive In of Iowa City, Inc., and
Lucky's Drive In of Scottsbluff,
Inc. (Defendants below),

v.

MILE HIGH—DART IN CORP., Appellee
(Plaintiff below).

No. 4340.

Supreme Court of Wyoming.

Oct. 8, 1974.

Paul B. Godfrey, Cheyenne, for appellant.

Walter C. Urbigkit, Jr., Urbigkit, Moriarity, Halle & Mackey, Cheyenne, for appellee.

Before PARKER, C. J., and McEWAN and GUTHRIE, JJ.

Mr. Chief Justice PARKER delivered the opinion of the court.

Defendant, Scotti's Drive In Restaurants, Inc., a franchisor of franchisee-owned hamburger outlets, has appealed from a judgment [1] of $13,863.12 issued by

1. The original action named two other corporations as defendants; however, there was
no service on the Iowa corporation and although judgment was entered against

the Laramie County District Court in favor of Mile High Oil—Dart In Corporation, plaintiff.

The judgment, which contained no special findings of fact or conclusions of law (none having been requested under the provisions of Rule 52(a), W.R.C.P.), covered funds realized from the sale of gasoline through plaintiff's pumps located on property leased by Lucky's Drive In of Scottsbluff, Inc., which money had been deposited by Lucky's manager to its account.[2]

■ Although the trial was somewhat protracted and the evidence quite voluminous, the matter presented to this court is, at least in first analysis, fairly simple, defendant stating in its brief and oral argument the *single* point for consideration to be that the trial court found for plaintiff on one issue: a trust relationship. Counsel's thesis is that under the circumstances disclosed by the record there can be no viable basis for holding that a trust existed. A scrutiny of the judgment reveals it to contain no reference to a trust relationship. The court, several days before the issuance of the judgment, wrote a letter to counsel indicating that it would hold for the plaintiff, saying at one point that the "parent organization [defendant] held and disbursed Plaintiff's funds in a trust relationship and is indebted to Plaintiff * * *." Without minimizing the value of such memoranda to the reviewing court or the desirability of its being a part of the record, we think any assumption that such a memorandum could take the place of special findings of fact and conclusions of law would be unjustified; and the judgment will be affirmed if sustainable on any legal grounds appearing in the record. In re Romer, Wyo., 436 P.2d 956, 958.

In 1966, Richard F. Pickett and W. Andrew Bunten, Jr., acting as Andi's, Inc., secured from Scotti's Drive In Restaurants, Inc., of which Arnold O. Flinn was president, the exclusive right to issue franchises for the use of "Scotti's" and "Lucky's" in the State of Nebraska.[3] The same year Pickett and a number of other Cheyenne investors entered into an incorporation agreement for the purpose of operating a drive-in restaurant in Scottsbluff, Nebraska, under a Lucky's franchise. There was no written franchise agreement between the Lucky's entity and defendant.

In February 1968 Lucky's and plaintiff's predecessor in interest, M H I Oil, Inc., acting by its president, James P. Federer, entered into a marketing agreement by which Lucky's was to be the distributor for the oil company, operating its dispensing equipment near the Lucky's restaurant installation for one-half of the gross profits from the sale of the oil products, with a minimum monthly guarantee of $300. By the terms of the agreement, the proceeds were to be deposited in the oil company's account opened at a Scottsbluff bank.

The controversy in this case arises out of the fact that by certain oral arrangements money which under the marketing agreement was to be deposited in the oil company's account was diverted to Lucky's account. The basic question before the trial court and in this appeal is whether defendant by its activities and the acts of its officers became liable to the oil company for the plaintiff's gasoline money which was diverted to and used by Lucky's.

Every witness who testified concerning the arrangement by which it was agreed that plaintiff's gasoline money was to be used to increase the cash flow of Lucky's testified that the initial meeting took place

Lucky's Drive In of Scottsbluff it made no appearance. Hence, this opinion refers only to Scotti's Drive In Restaurants, Inc., as defendant.

2. Over and above rent and guarantee allowance, some $2,572.05 had been deposited

from August 1968 through March 1969 and $11,291.07 from April 1969 through July 1969.

3. According to Flinn's testimony, defendant relieved the Nebraska franchisors in March 1968, "taking over the operation."

sometime in February or March 1969 when a number of Lucky's stockholders met with Flinn, defendant's president, to discuss the insufficiency of Lucky's funds to pay its current obligations. Versions of testimony on the subject tend to show that the idea of securing the money from plaintiff was Flinn's—although this is denied by Flinn —and that he called Federer, plaintiff's president, by phone and asked him to meet with them, Federer doing so the following day, and being asked by Flinn to consider depositing the money from gasoline sales into Lucky's bank account and then disbursing it in a manner which would give Lucky's a cash flow.[4] Federer left the meeting with no decision, but when Flinn called him a week later he said he would approve the funds going into "their" account, providing the money was repaid to him on a regular basis. This, together with the fact that plaintiff alleges defendant's accountant handled the money emanating from the sales of gasoline, is relied upon by plaintiff as evidence of defendant's liability. On the other hand, Flinn's testimony tended to show that he was merely acting to help Lucky's, that Federer corresponded with Lucky's officers and not with defendant's, and that while defendant was interested in the success of Lucky's, the transaction was not in any way that of Scotti's. Scrutiny of some of the testimony regarding the arrangement for the gasoline money throws light on the question before us.

Pickett, Lucky's president, said that he wasn't sure who called the meeting in the basement of his office. He said most of the Lucky's stockholders were present, the Scottsbluff store was in bad financial condition, and they were trying to find where they could perhaps secure some money to get it back on its feet. The proposition came up from Flinn; McCammon, the accountant;[5] or "somebody," that maybe gasoline money could be used for a time to "bail us out" and that a request should be made to Mile High Oil for use of the gasoline money. Pickett testified, "I understood * * * that we would ask them if we could use the money for probably—as I recall, it was to be three or four months; then we would repay them out of the gas proceeds following that time and/but as I say, this was a conversation that Arnie Flinn had apparently over the telephone to start with with Jim Federer." Later Pickett said, "we had a report from Arnie Flinn that he [Federer] agreed to let us use the gasoline money."

McCammon testified that Flinn told him the full cash flow of the gas operation would be available to Lucky's for six months or so. McCammon made decisions as to what bills were to be paid and wrote Lucky's checks.

Dudney, a stockholder of Lucky's, told how Flinn at the meeting early in 1969 suggested that he could make an arrangement with Federer for the use of some other funds, maybe as a loan, Flinn going to the telephone and calling Federer and later reporting that he thought possibly Federer would go along with the idea.

Flinn testified that at the meeting at Pickett's office, where all of the stockholders; McCammon; Dean Folker, Scotti's

---

4. As previously noted, some gasoline money had already been deposited directly into Lucky's account. When this had come to the accountant's attention he queried the manager who said "he had been told to withhold his moneys as part of this guarantee setup."

5. Flinn made McCammon's services available to those to whom franchises were sold, but he was not employed by Scotti's directly until July 1, 1969. From that time until October 1, 1971, McCammon was the defendant's comptroller. His following testimony was uncontradicted:

"Q What was your position in reference to the books in August of 1968? What was your title or position? A I was to—handling the reports under contract with the corporation.

"Q With which corporation? A Lucky's Drive In.

"Q Now, did you have a contract with them or did you have a contract with Scotti's International? A I was under contract to the individual locations."

vice-president; and Jack Schreiner, its field supervisor, were present:

"We told them this was an important meeting and we wanted everybody there. So after a discussion that it had to either have more money put into it or it had to be closed, the subject came up, what's going to happen; somebody in the room said, 'What's going to happen to the oil and gas deal with M.H.I.?' And it had been profitable, I guess, in a period of time that the hamburgers, the drive in, had been losing money. I think M.H.I. Oil made some money over there, I'm not sure. At least, the volume was up where it could have at certain times. So, someone suggested perhaps that if it had made money, maybe Mr. Federer would make a—in the form of a loan, the use of some of the M.H.I. gas funds that were coming in there daily. So I said, 'All right, I'll call him and see if he would come to a meeting and talk about this.' So, I related on the phone to him exactly what was going to happen to Lucky's, that it would have to be closed. And at first, he was very reluctant; and after we talked a while, he said, 'Okay, maybe we can help them out.' * * * And so, it was just the following week I talked to him on the phone again, and then I called Mr. McCammon and said that Mr. Federer is going to help out Lucky's to pay their accounts payable until Mr. Federer notifies you that the funds aren't to be used any more. * * *"

Uphoff, one of Lucky's stockholders, speaking of the early 1969 meeting, said that Flinn talked to Federer over the phone and when he came back said "that the money could be used, as I recall, for a period of approximately three months and payments would be made after that."

Federer testified regarding the meeting he attended in Pickett's office, indicating there had been a discussion as to their cash shortage on a daily basis and Flinn asked if Federer would consider depositing "this money" into an account other than that designated by plaintiff and "then disbursing it on a thirty day or twice weekly basis or something of this nature which would give them the cash flow which he felt would sustain their operation, with summer coming they would be short on cash. Right at that time I left the meeting with no decision." Asked who directed the inquiry to him, he said Flinn did and that:

"* * * possibly a week later * * * I received a call from Mr. Arnie Flinn asking me if I would * * * approve going ahead and putting this money in the * * * regular account. * * * I told him on the telephone that I would approve them putting these funds into their account providing it was paid to me on a regular basis, and that was the only conversation I had regarding it."

In considering the points presented by the parties in brief and argument, we note defendant's first contention, that under the statute of frauds, § 16–1, W.S.1957, a trust unless established by operation of law to be valid must be in writing, and similarly, any guaranty to be effective must reasonably indicate a clear intention to be bound for the debt of another. Plaintiff responds by urging, inter alia, that the question is whether defendant was "responsible for its agreement as negotiated by *its officer* relative to its use of funds, which in their use served its economic benefit" (emphasis supplied), and that if writing was necessary the record is replete with documentation.

■ We find no occasion to discuss in any depth the evidence of writing as a foundation for the claimed obligation without first examining to determine whether there was any proof of facts which would constitute a viable foundation for either a trust relationship or liability because of guaranty. As to the former, a trust is a fiduciary relationship in which one person is the holder of the title to property subject to an equitable obligation to keep or use the property for the benefit of another. Bogert, Law of Trusts, § 1 (Hornbook Se-

ries, 5 ed.). This definition is somewhat expanded in 15 Law Q.Rev. 301, where it is said:

> "A trust is an obligation imposed, either expressly or by implication of law, whereby the obligor is bound to deal with property over which he has control for the benefit of certain persons, of whom he may himself be one, and any one of whom may enforce the obligation."

See also Weltner v. Thurmond, 17 Wyo. 268, 98 P. 590, 595, 129 Am.St.Rep. 1113, 17 Wyo. 310, 98 P. 601, 99 P. 1128, 129 Am.St.Rep. 1113; Tibbals v. Keys, 40 Wyo. 524, 281 P. 190, 193.

■ It follows that unless defendant had control of the money, which was derived from the sale of gasoline through the oil company equipment, there could have been no trust relationship in this instance. The money went into the account of Lucky's; the checks drawn on that account, payable to Lucky's creditors, were written by Lucky's, being signed by McCammon, who was an employee of that corporation; and the only amounts which ever went to Scotti's were the checks to cover goods, services, or franchise fees. As previous recitation of testimony indicates, McCammon, the accountant, by his unchallenged testimony, was not an employee of Scotti's at the time in issue. Plaintiff's assumption to the contrary, upon which its reasoning is premised, does not bear scrutiny; and its argument as to trust relationship fails.

■ Some argument is presented that the judgment was warranted on the basis of unjust enrichment, joint venture, agency, third-party beneficiary, as well as guaranty, but all of these are grounded upon either the contention that McCammon was an agent of Scotti's or that Flinn made some contractual arrangement which bound Scotti's to pay plaintiff for the amounts which went into Lucky's account from the sale of the gasoline. Specific references to testimony which would justify such assertions are lacking, and we find no substantial evidence to support any of these contentions. It is conceded that Flinn was present at meetings of Federer with various stockholders of Lucky's; that it was for the best interests of defendant for some financial arrangements to be made which would allow Lucky's to survive, and that Flinn talked for and asserted efforts to that end. However, these circumstances alone are insufficient to create the claimed liability; and there was no testimony that any promises were made by Flinn on behalf of defendant, that the credit of defendant was pledged, or that there was an arrangement for that company to be responsible for the money which Lucky's had used to pay its bills.

Judgment reversed insofar as it pertains to Scotti's Drive In Restaurants, Inc.