Charles S. Smith, Appellant, v. William Hale Thompson et al., Appellees.

Gen. No. 35,736.

Opinion filed April 25, 1932.

MILLER, GORHAM & WALES, for appellant.

SAMUEL A. and LEONARD B. ETTELSON, EDWARD C. HIGGINS and JOHN G. DRENNAN, for appellees.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

By this appeal the complainant, Charles S. Smith, seeks to reverse a decree of the superior court of Cook

county sustaining the joint general and special demurrer of the defendants, William Hale Thompson and Richard W. Wolfe, sued individually and as trustees of the William Hale Thompson Flood Relief Fund, James W. Breen and the Water Way and Flood Control Association of the Mississippi Valley, a corporation, and dismissing the bill for want of equity.

The record discloses that on February 7, 1931, complainant filed his bill. The substance of the allegations, so far as it is necessary to state for the purpose of this opinion, is that during April and May, 1927, the Mississippi river and its tributaries overflowed their banks and caused great suffering to the residents of the Mississippi valley, a great many persons being made homeless; that the calamity was called to the attention of all the governmental agencies in the country and appeals for aid were broadcast; that on April 19, Governor Small of Illinois issued a proclamation calling on all citizens to contribute to funds to assist the flood sufferers in the southern part of Illinois, and designating the American Red Cross as the official recipient of the funds; that President Coolidge issued a call requesting contributions and that $750,000 was informally fixed as Chicago's quota; that a number of meetings were held in Chicago, and Mayor Thompson issued a proclamation on April 20, 1927, calling upon all citizens of Chicago to give promptly and generously in the emergency, and stating that such contributions would be received by the mayor's relief committee in the city hall; that the proclamation was printed in all the newspapers and was broadcast by radio; that while some prominent citizens' names were used as members of the relief committee, the funds collected and the whole management of the entire matter were conducted by Mayor Thompson; that the mayor stated the fund was for the immediate relief of the sufferers from the Mississippi valley

flood; that more than $6,000 subscribed to the fund by teachers and pupils of the public schools was turned over on May 11; that a great many employees of the city and other persons subscribed to the fund, the total amount raised being more than $139,000; that from time to time Mayor Thompson caused to be paid out of the fund for the relief of the sufferers more than $31,000. It is alleged that Mayor Thompson also paid out of the fund sums aggregating about $5,000 for his private and political purposes, in no way related to the relief of the flood sufferers, and that he caused to be turned over more than $103,000 to the "Water Ways and Flood Control Association of the Mississippi Valley," a corporation organized by himself and the defendants Wolfe and Breen, whose object was "to devise ways and means for the prevention of floods and to promote the development and extension of the waterways of the Mississippi valley, and secure the passage of such legislation as may be necessary therefor." It was further alleged that all the payments except the $31,000 were diversions and a misuse of the trust fund; that Oscar E. Carlstrom, Attorney General of the State of Illinois, as such had an interest in the proper management and distribution of public charity funds and he was made a party defendant; that complainant was interested in the fund as a contributor, he having contributed $50 to the fund in May, and that he brought suit on behalf of himself and all other persons who had contributed to the fund. The prayer of the bill was for an accounting and a receiver, or, in the alternative that the fund be distributed *cy pres* to the American Red Cross.

The Attorney General was served with summons but he filed no pleading and took no part in the suit. Afterward Mayor Thompson was succeeded in office by A. J. Cermak as Mayor of Chicago, who by his corporation counsel asked and obtained leave to inter-

vene. He filed a petition seeking to have the funds turned over to the "Governor's Unemployment Commission." As stated, the defendants demurred generally and specially to the bill and to the intervening petition of Mayor Cermak. The demurrer was sustained and the bill and intervening petition dismissed for want of equity, and complainant alone prosecutes this appeal.

The flood relief fund was a public charity, and as such was a trust fund over which a court of equity has jurisdiction, and it seems to be conceded by counsel for both parties that the court sustained the demurrer on the ground that the complainant, as a contributor of $50 to the fund, had no standing in a court of equity.

The chief question for decision in this case is: Has the complainant, as a contributor of $50 to the fund of $139,000 donated by many hundreds of people to be used for a public charity, a standing in a court of equity to enforce the proper administration of the trust fund?

The defendants' position is that the Attorney General, or the State's attorney, on behalf of the People of the State of Illinois, alone has the power to institute such suit. We think the defendants' position must be sustained. 2 Perry on Trusts and Trustees (7th ed.), p. 1255; *Clark v. Oliver*, 91 Va. 421; *Ludlam v. Higbee*, 11 N. J. Eq. 342; *Green v. Blackwell* (N. J. Eq.), 35 Atl. 375; *Strong v. Doty*, 32 Wis. 381; 11 Corpus Juris, p. 367; *Tyree v. Bingham*, 100 Mo. 451; *Dickey v. Volker*, 321 Mo. 235; *Newberry v. Blatchford*, 106 Ill. 584; *People v. Braucher*, 258 Ill. 604; *Petition of Burnham*, 74 N. H. 492; *Nolfe v. Byrne*, 142 Tenn. 309.

So far as we are advised by the clear, concise and able briefs filed by counsel for both parties in this case, the precise point has not been decided by the Supreme Court of Illinois. The question is not free from difficulty, but from a consideration of the authorities we are of the opinion that a contributor to a

fund creating a trust for public charitable purposes where, under no circumstances, is there any right of reverter, and the contribution is made without reservation, has no right to call the trustees of the fund to account for a misapplication of the fund or any other breach of the trust.

Perry in his work on the law of Trusts and Trustees, vol. 2 (sec. 732a, p. 1255, 7th ed.), states the rule thus: "When a property has become fully vested in trustees for a valid charitable purpose, neither the donor nor his heirs have any standing· in court in a proceeding to compel the proper execution of the trust, except as relators."

In *Clark v. Oliver, supra* (91 Va. 421), contributors to a fund for the education of negro children brought suit for themselves and other contributors, alleging that part of the fund had been diverted for the building of a church instead of being used for a school. A demurrer was sustained to the bill and upon appeal to the Supreme Court the decree was affirmed. The court there said (pp. 424–426): "The contributors to this fund parted with their interest in it, and when it was paid their control over it ceased. They are not described as persons belonging to the class intended to be benefited by the application of the fund. The money was devoted to a charitable use. As we have said, the whole interest of the donors was divested. There remained in them no scintilla of right. How then can they be heard in a court of equity with respect to the disposition of it? There is no such thing as a resulting trust with respect to a charity. . . . Where the donor has effectually passed out of himself all interest in the fund devoted to a charity, neither he nor those claiming under him have any standing in a court of equity as to its disposition and control. The law is so laid down in the case of *Ludlam and others v. Higbee and others,* 3 Stockton, 342 (11 N. J. Eq. 342), where it is said that 'the contributors to a fund

creating a trust for mere charitable purposes, cannot call the trustees of that fund to an account for a misapplication of the fund, or any other breach of the trust. There must be something peculiar in the transaction, beyond the mere fact of contribution, to give a contributor to a charitable fund a foothold in court to enable him to question the disposition of the fund.'

"It is said that a person who goes into a court of equity for such a purpose must have some interest in the trust. He must be a trustee, or *cestui que trust*, or have some reversionary interest in the trust fund. . . . In a suit to enforce a trust, if it appears that the plaintiffs have no direct interest in the enforcement of the trust, their bill will be dismissed. See 21 Barbour, 565; Perry on Trusts, section 873; and Story Equity Juris., section 1191." And continuing the court said (pp. 427–428): "In our opinion, where contributors have subscribed to a fund for a charitable purpose, and have paid it over to the hand by which it is to be received and applied, their interest in and control over it cease and determine, and whatever jurisdiction is thereafter entertained by the courts with respect to the disposition and control of this fund must be called into active exercise either by the Attorney General, acting on behalf of the public, or by the trustees charged with its custody and administration, or by some person having a beneficial interest in the object of the trust."

In *Ludlam v. Higbee, supra* (11 N. J. Eq. 342), quoted with approval by the Virginia court, it was held that as a general rule the contributors to a fund creating a trust for charitable purposes cannot call on the trustees of the fund to account for any misuse of the fund or for any other breach of the trust. In that case contributors to a trust fund for religious purposes filed their bill in which they averred that they were contributors to a fund raised by subscription for the erection of a church for persons holding the Presby-

terian faith, "for the free and perpetual use of . . . visitors," and it was alleged that the purpose of the trust had been violated when the property was conveyed to the Methodists, who afterward excluded all other denominations, as a result of which the complainant donors lost all their benefits and advantages thereof. The bill prayed for an accounting and the removal of the trustees. The court held that complainants were entitled to relief because the contributors to the fund "are interested in it as *cestuis que trust.*" But in passing on the rights of mere contributors to such a fund, the court said (p. 347): "It is insisted that the mere contributors to a fund creating a trust for charitable purposes cannot call the trustees of that fund to an account for a misapplication of the funds or any other breach of the trust. This is certainly true, as a general rule, and there must be something peculiar in the transaction beyond the mere fact of contribution to give a contributor to a charitable fund a foothold in this court for the purpose of questioning the disposition of the fund. A party who comes into a court of equity for such a purpose must have some interest in the trust. In general he must be a trustee, or *cestui que trust,* or have some reversionary interest in the trust fund."

In *Green v. Blackwell* (N. J. Eq.), 35 Atl. 375, it is said: "But I do not understand that a citizen of the State of New Jersey, not being a trustee or executor or otherwise especially interested, can file a bill in a case in which he seeks to do nothing more than vindicate a public right. In cases relating to charities, he may, indeed, be a relator in an information filed by the attorney general, but the presence of the attorney general is indispensable."

In *Strong v. Doty, supra* (32 Wis. 381), land was conveyed to trustees to erect a house of worship for the use of members of the Methodist Episcopal Church according to the rules and discipline of the general

conference of that church. The church was erected and used as such for about 30 years, when it was abandoned and the lot sold to parties who converted the property into a blacksmith and wagon shop. Suit was brought by one of the original grantors to enforce the trust. It was held the suit would not lie because the complainant was not shown to be a member of the Methodist Episcopal Church or to have any more interest in the property than had the general public, and that he could not maintain the bill merely on the ground that he was one of the original grantors. In stating this rule of law the court said (p. 386): "It is not alleged that he is a member of the Methodist Episcopal Church or has any more interest than the general public in the maintenance of a house of worship upon that lot. The fact that he was one of the grantors who originally made the gift does not give him any greater interest in the faithful execution of the trust, or any superior right to insist upon its proper enforcement, than any other individual."

In 11 Corpus Juris, page 367, the rule is stated: "As a general rule, the contributors to a fund creating a trust for mere charitable purposes cannot call the trustees of that fund to an account for a misapplication of the fund or any other breach of the trust. There must be something peculiar in the transaction, beyond the mere fact of contribution, to give a contributor to a charitable fund a foothold in court to enable him to question the disposition of the fund."

In *Tyree v. Bingham, supra* (100 Mo. 451), suit was brought by the donors of a fund to prevent the diversion of the trust fund. The Attorney General was made a party defendant because he refused to be a plaintiff. It was held that no cause of action was stated and this judgment was upheld by the Supreme Court. The court there said (pp. 464–465): "To the fund thus raised there is nothing in the petition that

suggests the idea that the amount contributed by the plaintiffs in the way of monthly dues, or otherwise, was relatively so large as compared with the contributions of others as to give any color to the claim made for them by counsel that they, as founders of this charity and the donors of its funds, have some right of a visitorial character that a court of equity ought to protect. As donors they stand upon the same plane in a court of equity with hundreds of others, who in the same and in other ways contributed to this same purpose. As donors to the fund they have no pecuniary interest in it. . . . (p. 465) And it follows that, not being trustees of and having no interest in the fund, except the sentimental one that every person who contributed to it may be presumed to have, that it should be applied to the purpose for which it was contributed, they have no such interest in the fund, and sustain no such relation to it as to give them a cause of action for its misappropriation.''

And in the late case of *Dickey v. Volker, supra* (321 Mo. 235), where there is an elaborate review of authorities on the question of charitable funds, the doctrine announced in the *Tyree* case, *supra,* was adhered to, and it was held that the Attorney General alone had the power to institute a suit to see that the funds of a public charity were properly administered. And it was held that the objection of improper parties plaintiff was not obviated by making the Attorney General an unwilling party defendant. The court held that the Attorney General, under the facts disclosed in the case, was the only party who could maintain the suit, and said (p. 254): ''He (plaintiff) argues that by the presence of the Attorney General all of the necessary parties are in court, but the Attorney General is not willingly in court. If the beneficiaries can be forced into court in this manner, then the Attorney General does not have the preclusive right to insti-

tute the suit. If he has that right, and we so hold, we are without authority to compel him as a party defendant to consent to the prosecution of the suit. Of course, if he did consent, as was done in the case of *Women's Christian Association v. Kansas City*, 147 Mo. 103, 48 S. W. 960, there would be a different question for solution. If the appellant is without authority to institute the suit, the unwilling presence of the Attorney General as a party defendant does not confer that authority upon him.''

We think our own Supreme Court has held that the Attorney General alone has the right to bring suit for the claimed abuse of the trust of a public charity. In *Newberry v. Blatchford, supra* (106 Ill. 584), the court said (pp. 595–597): ''But if it be assumed the name of the Attorney General was inadvertently omitted as a defendant to the original bill by accident or mere oversight, the difficulty does not lie in ascertaining the rule of law on this subject, but in its application. . . . The Attorney General, or other public officer whose duty it may be to have a care in such matters (public charity) is a proper party, either as complainant or defendant, and courts not infrequently hesitate to decree concerning a public charity unless the general law officer representing the donees is a party in some way. Exceptional cases are where the charity or bounty is in the hands of trustees charged by the donor specifically with its management for the *cestuis que trust*. There is much subtle learning in the books on this subject, but it is not deemed necessary to restate it, as it would tend in no considerable degree to enlighten the present inquiry. . . . Had it appeared the trustees were misappropriating the trust fund, it would no doubt have been the duty of the Attorney General to interpose for its preservation. It is only where the parties having charge of the fund unite in an abuse of their trust, and there is no one having a right to sue in his own name concerning it, as is the

case with regard to a public charity, the suit must, *ex necessitate rei,* be instituted by the Attorney General.'' And continuing the court said (p. 597): ''But conceding the Attorney General was a proper party to the bill, it would be as co-complainant, and not as defendant. Complainants and the Attorney General all desired to have the same thing done, viz., a construction of the will of the testator.''

In *People v. Braucher, supra* (258 Ill. 604), it was held that the Attorney General or State's attorney representing the public is charged with the duty of preventing a breach of the trust of a public charity, and that the suit could be maintained by such officers without making all members of the society to which the fund was given parties to the suit. In that case the bill was filed by the special State's attorney in the name of the People to prevent a breach of a trust for public charity, and he was held to be the proper party complainant.

The Supreme Court of New Hampshire in the *Petition of Burnham, supra* (74 N. H. 492), held that where a valid charitable trust was created by a will, the heirs of the testator had no interest in the question of the execution of the trust apart from the general public whose rights it was the duty of the Attorney General to protect. The court there said (p. 494): ''After . . . it was determined that the trust was charitable, it became the duty of the Attorney General to see that the rights of the public in the trust were protected and that it was properly executed. The heirs had no interest in the question apart from the general public, whose rights were represented by the Attorney General.''

The same rule—that the Attorney General alone could maintain a suit to enforce the observance of the charitable trust—was followed by the Supreme Court of Tennessee in the case of *Nolfe v. Byrne, supra* (142 Tenn. 309). The court there said (p. 315): ''Where there is a devise to a trustee for a definite charitable

purpose and the subject of the devise is adequate for the effectuation of that purpose, a court of equity will at the suit of the Attorney General compel the observance of the trust.''

But counsel for the complainant say that it has been held by the courts of this and other States that a contributor to a public charity has sufficient standing in a court of equity to complain of abuses in the administration of the trust. And the cases of *McGee v. Vandeventer*, 326 Ill. 425; *Barker v. Hauberg*, 325 Ill. 538; *Garrison v. Little*, 75 Ill. App. 402; *People ex rel. Replogle v. Burnham Hospital*, 71 Ill. App. 246; *Tate v. Woodyard*, 145 Ky. 613; *Associate Alumni v. General Theological Seminary*, 163 N. Y. 417; *O'Brien v. Physicians' Hospital Ass'n*, 96 Ohio St. 1; *Mills v. Davison*, 54 N. J. Eq. 659, are cited; but that in any event it is sufficient if an Attorney General is made a party to the suit either as complainant or defendant, citing *Attorney General v. Newberry Library*, 150 Ill. 229; *Newberry v. Blatchford*, 106 Ill. 584, and cases from other jurisdictions.

In the *McGee* case (326 Ill. 425) a suit was brought by the heirs of Thomas J. Caldwell, who by his will had left certain property to charities to be designated by his wife, Elsie Caldwell, during her lifetime. After his death his widow designated the beneficiaries in her will, and after her death it was contended that the designation was void and that certain of Thomas Caldwell's property should be held to pass to his heirs, the complainants, as intestate property. The bill prayed for a partition of certain real estate. The Supreme Court held that the designation of the beneficiaries by the widow was properly made and that the complainants had no interest in it. The complainants were successful in the trial court, but on appeal the decree was reversed. The court there said (p. 439): "The appellees (complainants) have no present interest or estate in the property which Thomas J. Caldwell owned

in his lifetime and devised by his will. They have at best no more than a remote contingent interest—the mere possibility of reverter, which always exists in law in case of charitable bequests to corporations. (*Mott v. Danville Seminary,* 129 Ill. 403; *Danville Seminary v. Mott,* 136 id. 289.) The donor of property to charitable uses has a standing to appear in court to restrain the diversion of the property from the charitable uses for which it was given. (*Green v. Old People's Home,* 269 Ill. 134; *Mills v. Davison,* 54 N. J. Eq. 659; *Chase v. Dickey,* 212 Mass. 553.) This right of the donor to require the application of the property to the purpose for which it was given exists also in the heir, to whom the possibility of reverter passes upon the death of the donor.'' And continuing the court said (p. 441): ''The Attorney General or State's attorney, representing the public, is charged with the duty of preventing a breach of a trust for a public charity or of requiring a restoration of a trust fund which has been diverted (*People v. Braucher,* 258 Ill. 604; *Attorney General v. Illinois Agricultural College,* 85 id. 516; *Hunt v. Fowler,* 121 id. 269; *Attorney General v. Newberry Library,* 150 id. 229); though, as we have seen, the donor or his heirs have the right to restrain the diversion of property given to charity from the charitable uses for which it was given.'' We think the *McGee* case is clearly distinguishable from the case at bar. In that case the heirs of Thomas J. Caldwell were claiming to own certain of the property which had been given to charitable purposes, and if they were successful the property would be taken from the public charity and revert to them. Obviously they had a standing in court. In the case at bar, the complainant claims no interest in the trust fund, and under the authorities above cited and discussed he has, we think, no standing to maintain the suit.

In the *Barker* case, *supra* (325 Ill. 538), it was held that the directors, managers or other agents or employees engaged in the administration of a public charity had no right in a court of equity to compel the maintenance and operation of the charity in order that they may continue to render services in the administration of the charity; that if the property had been legally dedicated to the use of the public charity, the Attorney General was the proper party to prevent its diversion. And, after discussing the facts in the case, which showed that there was no right in the complainants to maintain the suit, it was said (p. 551): "A private individual not a donor of the property to the charitable purpose or the heir of a donor cannot complain of its diversion." This language was used *arguendo* in connection with the facts in that case, and by no process of reasoning can it be held that the court was laying down a rule of law that every donor of property to a public charity could maintain a suit to prevent a diversion of the trust fund.

In the *Garrison* case, *supra* (75 Ill. App. 402), certain property was bequeathed to three trustees to be used by them for the attainment of woman's suffrage. The executors of the estate filed their final report and stated that the gift in question had lapsed by reason of the fact that two of the trustees had died. The third trustee filed objections to the report. The objections were overruled and an appeal taken to the Appellate Court. It was held that the bequest had not lapsed. It is to be observed that in that case the proceeding was in effect one brought by a trustee, and we think it clear that that case is not applicable to the facts in the case before us.

In the *Burnham Hospital* case (71 Ill. App. 246), it was held that a physician whose only interest in the government of a hospital was the hope of gains and profits that he might obtain from the practice of his profession, could not maintain a suit against the di-

rectors and managers of a hospital to compel them to allow him to practice his profession in the hospital, because he was not a beneficiary of the trust; and having disposed of this question the court said (p. 250): "The appellant was not a contributor to the fund by which the hospital was established, nor has he contributed to provide a fund to maintain it. The beneficiaries of the hospital are those unfortunates for whose relief and comfort it was established." We think it clear that this case is not authority for the proposition that a donor to a fund to be used for a public charity has a right to maintain a suit to prevent a diversion of that fund.

In the *Tate* case (145 Ky. 613), Woodyard gave a lot and a building to house a church and a lodge. Afterward the lodge conveyed the property in fee simple to a third party, and thereafter Woodyard brought suit, claiming that since the property was no longer used for the purpose for which it was given, it should revert to him and that the deed from the lodge to the third party should be canceled and set aside, and asking other relief. The court said (p. 615): "The circuit judge granted the second prayer of the petition, and adjudged that the deed from Robbins to Owens was and is null and void, that the attempted sale by Owens to Tate was null and void, and that neither Owens nor Tate acquired any right, title or interest in the land thereunder. The judgment went further and canceled the deed from Robbins to Owens, and enjoined both Owens and Tate from occupying or exercising any act of ownership over any part of said parcel of land. The effect of the judgment was to uphold the trust." The judgment of the lower court was affirmed. The deed from Woodyard there conveyed the property to a certain Masonic lodge for the "purpose of a lodge room and Baptist church and a graveyard." There the grantor or donor was claiming that under the facts the property reverted to him, or, if this was found to

be untenable, that the deed from the lodge to the third party be set aside. We think these facts render the case distinguishable from the case at bar. That case is not an authority for holding that in every case a mere donor to a public charity fund has a standing in court to see that the fund is not diverted.

In *Associate Alumni v. Theological Seminary* (163 N. Y. 417) certain alumni of the defendant college raised a fund to endow a professorship. The donors reserved the right of nomination to any vacancy occurring in the professorship. Disputes arose between the defendant and its alumni, the defendant wishing to change the terms of the professorship and claiming to hold the fund as its own, subject to application for the benefit of the Seminary in such way as the defendant trustees might determine, while the alumni claimed the defendant held the fund solely as trustee "for the purpose and upon the conditions prescribed by the alumni." It was held that under the facts disclosed in that case, the defendant had breached the duty in failing to comply with the terms and conditions of the donations. The court said (p. 422): "The general rule is, 'If the trustees of a charity abuse the trust, misemploy the charity fund, or commit a breach of the trust, the property does not revert to the heir or legal representative of the donor unless there is an express condition of the gift that it shall revert to the donor or his heirs, in case the trust is abused; but the redress is by bill or information by the Attorney General or other person having the right to sue." We think the facts in that case are not analogous to the facts in the case before us. There, the donors had raised the fund and given it to the defendant, reserving certain rights in themselves; while in the instant case there was no right reserved by the complainant when he donated the $50 to the charity fund.

In the *O'Brien* case, *supra* (96 Ohio St. 1), an action was brought by the hospital association claiming that

the hospital was exempt from tax on account of it being a public charity, and the county treasurer was enjoined from attempting to collect taxes against the property. The court said that the evidence showed the hospital was conducted as a public hospital, open at all times to the public, and further said (p. 7): "It (defendant's property) was purchased with trust funds donated for the purposes of a public charity hospital, and is impressed with that trust. . . . The donors of this fund have parted with all private ownership in the fund itself. They have no property interest in the fund, or the real estate purchased with the fund, and no rights whatever in relation thereto, except to compel the administration of the trust in accordance with the terms of the gift." It does not appear from the case what the terms of the gift were. There was no discussion in that case about the question of the rights of a donor to maintain a suit seeking to prevent a misuse of the trust funds.

In the *Mills* case, *supra* (54 N. J. Eq. 659), a bill was filed to foreclose a mortgage belonging to a church which had been conveyed to the church by Alfred Mills and wife, the conveyance being made upon condition that a building be erected on the property for public worship and teaching in accordance with the usages, rites and ceremonies of the Protestant Episcopal Church in the United States of America. Mills filed a cross-bill and claimed any surplus that might remain after the payment of the mortgage. The court held that Mills was not entitled to any surplus because he had conveyed away all his interest in the property, but said that he, as founder of the charity, had a standing in court to restrain the diversion of the property donated. This was said *arguendo,* and apparently it was not intended to lay down a rule different from that announced by the same court in *Ludlam v. Higbee,* 11 N. J. Eq. 342, *supra.*

From the foregoing we are of the opinion that a mere donor to a fund creating a trust for a public charity cannot call the trustees of that fund to an account for a misapplication of the fund, or any breach of the trust, unless there is something peculiar in the transaction beyond the mere fact of contribution.

But the defendants say that in any event the decree was wrong in dismissing the suit for want of equity because the Attorney General was made a party defendant, and since he filed no pleading and took no part in the case, it must be presumed that he was satisfied with what the complainant was seeking to do. Some cases which we have above referred to, such as the *Newberry* case, 106 Ill. 584, have said that the Attorney General should be a party to such a proceeding either as complainant or defendant. That case was brought to construe a will, and the question of the enforcement of a public trust was not considered. We have above quoted from that case, in which it was stated: "Conceding the Attorney General was a proper party to the bill, it would be as cocomplainant, and not as defendant." Obviously, where the complainant is trustee, beneficiary or donor, under certain conditions, the Attorney General must be made a party defendant, and in other cases it is equally obvious that he should be made the complainant. And even if the Attorney General were made a party defendant when he should have more properly been a cocomplainant, yet if the record discloses that he was looking after the interests of the public in the suit, any decree that might be entered ought not to be disturbed, if it was warranted under the pleadings and the evidence, because the Attorney General was nominally on the wrong side of the case. But in the instant case the complainant having donated $50 to the fund of more than $139,000, which fund was donated by a great many people, and since we hold that the complainant had no standing in a court of equity, under the facts

disclosed by the record, we think his disqualification to maintain the suit was not obviated by merely joining the Attorney General as a defendant.

The question of the propriety of sustaining the demurrer to the intervening petition of Mayor Cermak is not before us since he made no complaint and has not appealed.

The decree of the superior court of Cook county is affirmed.

*Affirmed.*

McSurely and Matchett, JJ., concur.