# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 32

**OCTOBER TERM, A.D. 2013**

*March 4, 2014*

| | |
|---|---|
| THE COURTENAY C. AND LUCY PATTEN DAVIS FOUNDATION AND AMY DAVIS, Individually, | |
| **Appellants (Plaintiffs),** | |
| v. | |
| COLORADO STATE UNIVERSITY RESEARCH FOUNDATION, UNIVERSITY OF WYOMING FOUNDATION AND C.C. DAVIS AND CO., LLC, A Wyoming Limited Liability Company, | S-13-0121 |
| and | |
| GREGORY A. PHILLIPS, WYOMING ATTORNEY GENERAL, in his official capacity, | |
| **Appellees (Defendants).** | |

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellants:*
Steve Miller of Steve A. Miller, P.C., Denver, Colorado; Gay Woodhouse and Tara B. Nethercott of Woodhouse Roden Nethercott, LLC, Cheyenne, Wyoming. Argument by Mr. Miller.

*Representing Appellees Colorado State University Research Foundation, University of Wyoming Foundation, and C.C. Davis And Co., LLC, a Wyoming Limited Liability Company:*

Michael J. Sullivan and Alaina M. Stedillie of Lewis Roca Rothgerber, LLP, Casper, Wyoming.  Argument by Mr. Sullivan.

*Representing Appellee Gregory A. Phillips, Wyoming Attorney General, In His Official Capacity***:**

No Appearance

*Before HILL, VOIGT,\* BURKE, and DAVIS, JJ., and GOLDEN, J., (Ret.)*

*\* Justice Voigt retired effective January 3, 2014*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GOLDEN**, Justice (Ret).

[¶1]   In 1997, the Courtenay C. Davis Foundation ("the Davis Foundation") and Amy Davis (collectively "the Davis Interests") entered into an agreement with the Colorado State University Research Foundation and the University of Wyoming Foundation ("the University Foundations").  Through that agreement, the Davis Interests gifted land and other interests to the University Foundations, subject to the terms of the agreement.  In 2011, the University Foundations decided to sell the gifted property.  The Davis Interests filed an action in district court seeking to enjoin the sale of the gifted property, and the district court dismissed the action after finding that the Davis Interests lacked standing to bring the action.  We affirm.

## ISSUES

[¶2]   The Davis Interests state the issues on appeal as:

> Issue 1
> > Did the district court err in finding [the Davis Interests] lacked standing?

> Issue 2
> > [Do the Davis Interests] have standing as a management committee member?

[¶3]   The University Foundations phrase the issues on appeal as:

> 1.     Was the transaction between the Davis Interests (Appellants) and the University Foundations (Appellees) a gift, or, as claimed by the Appellants, did it create an implied trust?

> 2.     In either event, do the Appellants have standing?

> 3.     Is the issue raised by Appellants concerning the Davis Interests' entitlement to appoint a member to the five member Ranch Management committee and Amy Davis' role as an unpaid consultant a new argument that has been waived?

> 4.     If it is not a new issue, do the Davis Interests' entitlement to appoint a member to the five member Ranch Management committee or Amy Davis' role as an unpaid consultant support Appellants' standing argument?

1

## FACTS

[¶4]   The Y Cross Ranch is a working cattle operation located in Laramie and Albany counties and is owned and operated by C.C. Davis and Co. L.L.C. ("LLC").  In 1997, the Davis Foundation owned a 99% membership interest in the LLC, and Amy Davis owned a 1% interest in the LLC.  On August 25, 1997, the Davis Interests and the University Foundations entered into a Memorandum of Agreement ("MOA") by which the Davis Interests agreed to donate the Ranch to the University Foundations, by transferring ownership in the LLC to the University Foundations, with each university's foundation receiving a 50% share in the LLC.  Concurrent with the donation from the Davis Interests to the University Foundations, the LLC granted The Nature Conservancy a Deed of Conservation Easement.

[¶5]   The donation to the University Foundations included the membership interests in the LLC; real property and improvements, subject to certain reservations and the conservation easement; $50,000.00 in the LLC's checking account; and equipment and supplies, among other items.  The MOA provided that the purpose of the gift to the University Foundations was to:

> A.     generate scholarships and internships for CSU and UW students through net revenues generated from ranch operations, and

> B.     provide a "real world" working laboratory for observation and study by CSU and UW students of western ranching and resource management.

[¶6]   The MOA directed that the University Foundations adopt an operating agreement for the LLC and establish a management committee consisting of five individuals: (1) a representative of the University of Wyoming Foundation; (2) a representative of the Colorado State University Research Foundation; (3) the dean of the University of Wyoming College of Agriculture (or his/her designee); (4) the dean of the Colorado State University College of Agriculture (or his/her designee); and (5) a person appointed by the Davis Foundation.  The MOA further specified that "Ms. Amy Davis will be engaged as a non-paid consultant to the Management Committee for a period of seven years after the date of the gift to ensure that the intent of the donors is met."

[¶7]   In addition to outlining the LLC organizational structure, the MOA established a "Prospective Business Plan" for the Ranch.  The MOA described Phase 1 as a period not expected to exceed seven years during which the Ranch was to be stabilized and "some degree of predictability" brought to its operating requirements.  The MOA described Phase 2 of the business plan as a period of an additional seven years, during which the management committee was to "concentrate on making funds available from ranching

2

operations for transfer to the endowment funds in support of scholarship/internship support and the establishment and implementation of activities for observation, research and study laboratories/activities."

[¶8]    The MOA addressed the options available to the University Foundations at the conclusion of the fourteen-year span of phases one and two, providing, in part:

> X.    Duration of the CSU-UW Joint Ownership.    It is the hope and expectation of the donors that the joint ownership of the ranch (through the structure of the LLC) will thrive and be a model of shared governance for a common interest. . . .
>
> At the conclusion of Phase 2, fourteen years after the date of the gift, the members are encouraged to continue the joint arrangement as originally contemplated for an indefinite term.   However, in the event that either member wishes to dissolve the joint arrangement, the dissolution may be accomplished by one of the following alternatives:
>
> A.    The ranch and other assets of the LLC would be sold at market value, subject to the conservation easement, with all net proceeds divided equally between the members and to be deposited in the respective endowments to fund scholarship/internships as provided in this agreement; or
>
> B.    By mutual agreement, one member would become the sole owner of the ranch and other assets of the LLC.   In that event, the acquiring member would purchase from the other member the assets of the LLC or the other member's interest in the LLC at the appraised value of the membership interest in the LLC at the time of the initial gift in 1997, immediately after the grant of conservation easement.   (Purchase at the 1997 value would make it easier for the acquiring institution to continue stewardship and use of the ranch for the intended purposes.)   The acquiring member would continue to operate the ranch in substantially the same manner as herein set forth and for the same purposes for a period of no less than ten (10) years.
>
> C.    Not earlier than the conclusion of Phase 2 under the business plan, in the event both members wish to acquire the ranch and other assets of the LLC to the exclusion

3

of the other member, then the member which first wishes to acquire those interests shall determine a value and the other member will decide whether it wishes to buy or sell.

Dissolution of the LLC, transfer of the LLC membership interests, and liquidation of LLC assets shall be carried out as specified in the Operating Agreement of the C.C. Davis and Co. L.L.C.; provided, however, that no provision in this Memorandum of Agreement or the Operating Agreement shall replace or take priority over rights, duties or obligations arising under applicable laws of the state of Wyoming.

[¶9]   In 2011, after fourteen years had elapsed following the donation from the Davis Interests, the University Foundations decided to sell the Ranch, and they listed it for sale through a sealed bid procedure to take place on November 13, 2012.  On September 28, 2012, the Davis Interests filed an action in district court alleging breach of contract, unjust enrichment and breach of the covenant of good faith and fair dealing.  The Davis Interests sought rescission of the MOA and establishment of a constructive trust in their favor.  On that same date, the Davis Interests filed an application for preliminary injunction, seeking to enjoin sale of the property during the pendency of the action.

[¶10]  On October 22, 2012, the University Foundations moved to dismiss the complaint for lack of standing.[1]  Specifically, the University Foundations argued that the Ranch donation was a charitable gift and, by common law, the only party with standing to enforce a charitable gift is the attorney general.  On November 13, 2012, the Davis Interests filed an amended complaint, which added allegations that the MOA created an implied charitable trust and that the University Foundations had breached their fiduciary duties.  The Davis Interests also added the attorney general as a party but asserted no claims against him, and they requested only the relief they had originally requested— rescission of the MOA and establishment of a constructive trust.  In opposition to the motion to dismiss, the Davis Interests argued that the donation created an implied charitable trust, that Wyoming's Uniform Trust Code governs the trust, and that the Code grants the Davis Interests, as the trust's settlor, standing to enforce the terms of the trust.  The Davis Interests also argued that the MOA was a conditional contract, with both conditions precedent and subsequent, and that the Davis Interests had standing to assert the forfeited donation.

[¶11]  The district court granted the University Foundations' motion to dismiss.  The court found that the donation by the Davis Interests was a gift, that it did not create a

---

[1] The University Foundations noted in their motion to dismiss that following Davis Interests' filing of the complaint, the parties stipulated to postpone any sale of the Ranch, pending outcome of the litigation.

4

charitable trust, and that only the attorney general had standing to enforce any restrictions on the gift. Alternatively, the court concluded that even if the donation could be construed to create an implied charitable trust, the attorney general would still be the only party with standing to enforce the MOA. The court reasoned that Wyoming's Uniform Trust Code did not apply because, by the Code's plain terms, it applies only to express trusts. The court thus concluded that, in the absence of the Code's provision conferring standing on the settlor, the common law rule limiting standing to the attorney general was controlling. Finally, the court found that the MOA contained no provision that would force a forfeiture of the donation should the University Foundations fail to comply with an MOA requirement, and the court therefore rejected the Davis Interests' condition subsequent argument.

[¶12] The Davis Interests timely appealed the district court's order dismissing the complaint for lack of standing. We affirm.

## STANDARD OF REVIEW

[¶13] This Court reviews a district court's decision to grant a motion to dismiss *de novo*. *Ridgerunner, LLC v. Meisinger*, 2013 WY 31, ¶ 10, 297 P.3d 110, 114 (Wyo. 2013). We have said:

> When claims are dismissed under W.R.C.P. 12(b)(6), this court accepts the facts stated in the complaint as true and views them in the light most favorable to the plaintiff. Such a dismissal will be sustained only when it is certain from the face of the complaint that the plaintiff cannot assert any facts that would entitle him to relief. *Story v. State*, 2001 WY 3, ¶ 19, 15 P.3d 1066, ¶ 19 (Wyo. 2001). Dismissal is a drastic remedy and is sparingly granted; nevertheless, we will sustain a W.R.C.P. 12(b)(6) dismissal when it is certain from the face of the complaint that the plaintiff cannot assert any set of facts that would entitle that plaintiff to relief. *Robinson v. Pacificorp*, 10 P.3d 1133, 1135-36 (Wyo. 2000).

*Ridgerunner*, ¶ 10, 297 P.3d at 114 (quoting *Bonnie M. Quinn Revocable Trust v. SRW, Inc.*, 2004 WY 65, ¶ 8, 91 P.3d 146, 148 (Wyo. 2004)); *see also Miller v. Wyo. Dep't of Health*, 2012 WY 65, ¶ 11, 275 P.3d 1257, 1260 (Wyo. 2012) ("A motion to dismiss, even though sparingly granted, is the proper method for testing the legal sufficiency of the allegations and will be sustained when the complaint shows on its face that the plaintiff is not entitled to relief." (quoting *Mummery v. Polk*, 770 P.2d 241, 243 (Wyo. 1989))).

**DISCUSSION**

[¶14] The Davis Interests assert in their statement of facts that the MOA imposed a condition subsequent, but they do not on appeal present an issue or argument related to that claim, or otherwise directly contest the district court's rejection of their condition subsequent claim. Nor do the Davis Interests argue that the donation and MOA created an express trust. Instead, the Davis Interests argue that the donation and MOA created an implied trust, rather than a restricted gift, and that the Davis Interests had standing to enforce the MOA as settlor of the implied trust. Alternatively, they argue that they have standing as a member of the management committee established by the MOA. We will first address the Davis Interests' implied trust argument and then turn to the standing question.

A.      **Implied Trust**

[¶15] We begin our discussion with a brief summary of the distinctions between express and implied trusts and the different types of implied trusts. Under Wyoming law, express trusts are governed by statute, and the elements of an express trust are statutorily defined. *See* Wyo. Stat. Ann. §§ 4-10-101 to -1103 (LexisNexis 2013). In contrast, an implied trust is an equitable remedy.[2] 1 Austin Wakeman Scott et al., *Scott and Ascher on Trusts* § 3.4.6 (5th ed. 2006); 76 Am.Jur.2d *Trusts* § 128 (2005).

[¶16] Implied trusts may be further classified as either a constructive trust or a resulting trust. 76 Am.Jur.2d, *supra*, § 128. A constructive trust is "[a]n equitable remedy that a court imposes against one who has obtained property by wrongdoing. A constructive trust, imposed to prevent unjust enrichment, creates no fiduciary relationship. Despite its name, it is not a trust at all." *Black's Law Dictionary* 1649 (9th ed. 2009); *see also Baker v. Ayres and Baker Pole and Post, Inc.*, 2007 WY 185, ¶ 16, 170 P.3d 1247, 1251 (Wyo. 2007) ("A constructive trust is an equitable remedy imposed to compel a person who unfairly holds a property interest to hold that property in trust for the person for whom, in equity and good conscience, it should be held."). A resulting trust is one "imposed by equity when property is transferred under circumstances suggesting that the transferor did not intend for the transferee to have the beneficial interest in the property." *Black's Law Dictionary* 1653 (9th ed. 2009); *see also McConnell v. Dixon*, 68 Wyo. 301, 332, 233 P.2d 877, 887 (1951) (resulting trust arises in favor of person who transferred property or caused transfer under circumstances raising inference that he intended to transfer bare legal title and not to give transferee beneficial interest). Although both constructive trusts and resulting trusts are implied trusts, they are distinct concepts:

---

[2] In some states, implied trusts are also governed by statute, but that is not the case in Wyoming. *See* 76 Am.Jur.2d *Trusts* § 129 (2005).

Despite some confusion in the courts between resulting and constructive trusts, the concepts are distinguishable. A resulting trust exists where the acts or expressions of the parties indicate an intent that a trust relation result from their transaction; a constructive trust is a trust imposed by a court of equity to compel a person who unfairly holds a property interest to convey such interest to the rightful owner.

76 Am.Jur.2d, *supra*, § 132 (footnotes omitted); *see also Cook v. Elmore*, 27 Wyo. 163, 169-70, 192 P. 824, 826 (1920) (distinguishing between resulting and constructive trusts).

[¶17] In their original complaint, the Davis Interests sought imposition of a constructive trust in their favor. They repeated that prayer for relief in their amended complaint and also added the allegation that an implied trust had been created when the parties entered into the MOA. In asserting their standing to bring this action, the Davis Interests have not, however, argued that their request for establishment of a constructive trust imbued them with standing. Their argument has been and remains that an implied trust must be recognized to give effect to the donor's intent that the property be held in trust, and recognition of that implied trust gives them standing to bring this action. The implied trust that the Davis Interests assert in advocating for their standing is essentially the resulting trust form of an implied trust, and accordingly, we will look to the law governing resulting trusts to evaluate whether the MOA created an implied trust.

[¶18] As indicated above, a resulting trust is recognized where the circumstances indicate that the transferor of property did not intend the transferee to have the beneficial interest in the property and instead intended that the property be held in trust. Intent as an element of a resulting trust is described as follows:

Intention, although only presumed, implied, or supposed by law from the nature of the transaction or from the facts and circumstances accompanying the transaction, particularly the source of consideration, is always an element of a resulting trust. In fact, a resulting trust is sometimes referred to as an "intention-enforcing" trust. Such a trust arises by operation of law, without an expressed intent; it arises by implication of law to enforce the intent of the parties, as presumed or inferred from the facts and circumstances surrounding the transaction. Thus, a resulting trust exists where the acts or expressions of the parties indicate an intent that a trust relation was to have resulted from their transaction. Likewise, as sometimes stated, a resulting trust is designed to give effect to the actual intention of a party although that intention was not directly expressed.

7

A resulting trust generally arises when the parties have used ambiguous language which the court construes as showing a trust intent, or where the parties have expressed no intent to create a trust by words, but have performed acts from which the court infers that a trust was intended. Such a trust attempts to give a vague or incomplete agreement substance that was originally intended by the parties. However, a resulting trust does not arise where the transfer of property is made to one person and the purchase price is paid by another if the person by whom the purchase price is paid manifests the intention that no resulting trust should arise. Additionally, where an alleged trust relationship is just as consistent with that of a gift or loan, courts will ordinarily not impress a resulting trust.

A resulting trust arises or may be judicially imposed on one holding legal title to property if it was obtained under facts and circumstances disclosing an intention that the beneficial interest was not to be enjoyed by the legal titleholder; in such instances, the courts infer that the holder of title holds it in trust for the beneficial owner, although there is no express intention to create a trust.

76 Am.Jur.2d, *supra,* § 138 (footnotes omitted).

[¶19]  As both parties agree, this Court, in *Town of Cody v. Buffalo Bill Mem'l Ass'n*, 64 Wyo. 468, 491-93, 196 P.2d 369, 377 (1948), adopted a common law implied trust remedy, acknowledging that even where an express trust is not created, the circumstances may demand that a property conveyance result in the creation of an implied trust. Although the Court did not use the term "resulting trust" in its decision, the implied trust recognized in *Town of Cody* is consistent with a resulting trust as defined above; that is, a trust implied to give effect to the parties' intentions where those intentions are otherwise not clearly expressed.  The Court explained:

Grants made to a charitable corporation may, of course, be of various kinds. They may be absolute or, on the other hand, proper terms, conditions and directions may be annexed thereto. In the latter case, the terms, conditions and directions annexed must be carried out. If the grants are absolute, and no purpose is expressed for which they are made, the property may be used in such manner as those in control deem best for the accomplishment of the corporate purposes, and these

8

purposes are determined by the charter and the statutes relating thereto. In such case, there is a presumption that the grants were intended for charitable uses, and an implied trust, enforceable in the courts, arises that they shall be so used.

*Town of Cody*, 64 Wyo. at 491-92, 196 P.2d at 377 (citations omitted).

[¶20] In considering whether we should find an implied trust in the case now before us, it is helpful to review the facts with which the Court was confronted when it recognized the creation of an implied trust in *Town of Cody*. In *Town of Cody*, the Court had before it a title dispute over several tracts of land in or adjoining Cody that had been donated to the Buffalo Bill Memorial Association. 64 Wyo. at 480-81, 196 P.2d at 372. A museum was constructed on a portion of the land, and the association used admission charges to defray the museum's operating costs. *Id*. The dispute before the Court arose when the association experienced a slump in revenue due to World War II's impact on museum visits and turned to the town for financial assistance. *Id*. In exchange for the town's agreement to cover certain of the association's expenses, the association conveyed all of its property to the town. *Id*. After the war ended and the association was able to repay the town, the association sought return of the property. *Id*. The town refused to return the property and filed suit to quiet title to the property. *Id*.

[¶21] Although not expressly set out as the issue in *Town of Cody*, our review indicates that the central question with which the Court grappled in the case was whether the association's conveyance of the disputed property to the town was void because the association lacked authority to convey the property. 64 Wyo. at 495-96, 196 P.2d at 377-78. In particular, the Court had to determine whether the association owned the land or held it in trust, understanding that a finding that the association held the land in trust would restrict its ability to freely convey the property. *Id*. In considering that question, the Court had to look to the terms of the original conveyances to the association, which were described as follows:

> The corporation acquired about 55 acres of land situated in or adjacent to the town of Cody. For convenience, it may be said that the acreage is divided into three different tracts. The museum of the association is located on Tract No. 1, being the northeasterly tract of the 55 acres hereinbefore mentioned, and the extent thereof is about 400 feet in length and about 300 feet in width. This tract of land was held by the Buffalo Bill Memorial Association under a deed executed by Hiram S. Cody, Francis A. Cody, Harry B. Cody, and Mary Jester Allen, individually and as trustees of the Cody Family Memorial Board. The deed reads in part as follows:

The importance of Colonel William F. Cody's contribution, and the magnitude of his service, to his beloved country places a burden upon us who bear his name. In partial fulfilment of that duty placed upon us by our blood kinship to a great man, we hereby grant, bargain, sell and convey, in consideration of One Dollar and other valuable consideration, to the Buffalo Bill Memorial Association, Incorporated, for the purpose of a perpetual Memorial to Colonel William F. Cody (Buffalo Bill) the following described property: (Here follows the description.)

We feel that it is fitting and proper that those who are bound to him by ties of blood should continually work to promote this memorial. We, therefore, in a spirit of service, make it a condition of this grant, that, perpetually, two members of the Cody family be members of the governing body of the Buffalo Bill Memorial Association, Incorporated. During their lifetime, Hiram S. Cody and Mary Jester Allen, or persons designated by them, shall be the members of said Board representing the Cody family.

It is also made a condition of this grant that during her lifetime, Mary Jester Allen shall remain in charge of the Buffalo Bill Museum, and the relics and mementos placed therein.

Tract No. 2 is located immediately south of Tract No. 1, and has for many years been used as an athletic field by School District No. 6, supra, and was dedicated by the Town to the school district for that purpose. We are told that it is to be called the William F. Cody Memorial Field. The north half of this tract was deeded by the Lincoln Land Company to the Buffalo Bill Memorial Association without any conditions or reservations. The south half of the tract was conveyed to the association by Robert D. Dripps "in order to perpetuate the memory of Colonel William F. Cody." Tract No. 3, consisting of forty acres, is located west of the other tracts, and also was conveyed to the association by the conveyance of Robert D. Dripps above mentioned. The equestrian statute of William F. Cody is located on the northern boundary of this tract.

*Town of Cody*, 64 Wyo. at 484-85, 196 P.2d at 373-74.

[¶22] There was no contention in *Town of Cody* that an express trust had been created in conjunction with any of the original land conveyances to the association. And, as the above-quoted description shows, the conditions or restrictions that were placed on the conveyed land's use ranged from broad and general to non-existent. None of the conveyances spoke to the association's authority to sell or otherwise dispose of the donated land. Faced with this void, the Court looked to the circumstances surrounding the conveyances, specifically that the conveyances were made to the association as a charitable entity chartered

> to establish and maintain a historical society for the preservation of the history and antiquities of the County, the Town of Cody, the County of Park and the State of Wyoming; to build, construct and maintain an historical monument or memorial statue in honor of and to perpetuate the memory of our late lamented fellow townsman Hon. William F. Cody, (Buffalo Bill).

*Town of Cody*, 64 Wyo. at 482-83, 196 P.2d at 373.

[¶23] Given this context, the Court found "that the grants were intended for charitable uses, and an implied trust, enforceable in the courts, arises that they shall be so used." *Id.* at 492, 196 P.2d at 377. As we noted above, the Court did not refer to the implied trust as a "resulting trust," but the trust was by its nature and definition a resulting trust, imposed by the Court to give effect to the intent of the parties to the conveyance. *See id.* at 493-95, 196 P.2d at 377-78.

[¶24] We agree with the University Foundations that the case now before the Court is fundamentally different from that before the Court in *Town of Cody*, and we conclude that the facts and circumstances of this case simply cannot support the finding of a resulting trust. To reiterate:

> [A] resulting trust exists where the acts or expressions of the parties indicate an intent that a trust relation was to have resulted from their transaction. Likewise, as sometimes stated, a resulting trust is designed to give effect to the actual intention of a party although that intention was not directly expressed.
>
> A resulting trust generally arises when the parties have used ambiguous language which the court construes as showing a trust intent, or where the parties have expressed no

intent to create a trust by words, but have performed acts from which the court infers that a trust was intended. Such a trust attempts to give a vague or incomplete agreement substance that was originally intended by the parties.

76 Am.Jur.2d, *supra,* § 138 (footnotes omitted).

[¶25] In *Town of Cody*, the Court had before it conveyance instruments that imposed vague restrictions, if any, on how the conveyed property was to be used, and it thus had a gap that would support imposition of a resulting trust. Here, the Court is presented with an MOA that is lengthy, detailed, and specific, and that the Davis Interests do not suggest is in any way ambiguous. Indeed, the MOA leaves no ambiguity in how the property was to be used, when and how it could be disposed of, and how the proceeds could be used in the event the University Foundations decided to sell the property. Under these circumstances, we can find no void in the parties' agreement that requires filling by the creation of a resulting trust.

[¶26] We turn then to the question of whether the MOA reflects an unexpressed intention that the property conveyed to the University Foundations be held in trust. Such an intention must be established by clear and convincing evidence. *Carpenter & Carpenter v. Kingham*, 56 Wyo. 314, 384, 109 P.2d 463, 475-76 (1941); *Platte County State Bank v. Frantz*, 33 Wyo. 326, 343, 239 P. 531, 537 (1925); *see also* 76 Am.Jur.2d, *supra,* § 135.

[¶27] The Davis Interests argue that the "MOA is replete with specific and express restrictions, thus making it a trust." In further support of their argument, they have submitted an over two-page non-exhaustive list of twenty-five restrictions that the MOA imposed on the University Foundation's use of the conveyed property. While the list of restrictions does underscore the MOA's attention to detail, we do not agree with the Davis Interests that the presence of such restrictions necessarily converts a gift into a trust. *See Persan v. Life Concepts, Inc.*, 738 So.2d 1008, 1010 (Fla. Dist. Ct. App. 1999) (rejecting claim that land donation for specific purpose of building homes for disabled persons created a resulting trust). The *Persan* court reasoned as follows in finding no trust based on restrictions attached to a gift:

> Although we may agree that it is regrettable that the homes will not continue to operate as residences for the disabled plaintiffs, there is no merit to the plaintiffs' suit and the lower court correctly entered a judgment of dismissal after trial. The lower court found that the donations had been made for a specific purpose but that no trust was proved. The dissent finds this to be inconsistent but it is not. Making a gift to a charity for a specific project or purpose does not create a

12

charitable trust. For this court to suggest that it does would create havoc for charitable institutions. A charity has to be able to know when a donation is a gift and when it is merely an offer to fund a trust for which the charity is taking on fiduciary responsibilities. The creation of such a trust must be express. Besides, as the lower court noted, the object of the gift was carried out--the two homes were built and were operated for almost fifteen years.

*Id.*

[¶28]  As is evident from this Court's holding in *Town of Cody*, we do not agree with the Florida court's view that a charitable trust must be express to be enforced.  We do, however, agree with the court's emphasis on giving effect to the parties' intent and with the rejection of a rule that would require a restricted gift be treated as a trust per se.  As another court explained:

> Where the alleged trust relationship is just as consistent with that of a gift or loan, courts will not ordinarily impress a resulting trust. This is a natural corollary of the general definition of a resulting trust: A resulting trust arises to give effect to the relationship *intended* by the parties thereto.

*Lewis v. Poduska*, 481 N.W.2d 898, 902 (Neb. 1992) (citations & quotation marks omitted); *see also Meima v. Broemmel*, 2005 WY 87, ¶ 55, 117 P.3d 429, 447 n.28 (Wyo. 2005) ("[I]n general at least, no trust is created where the transaction is as consistent with another type of transaction as with that of a trust." (quoting *Dallas Dome Wyo. Oil Fields Co. v. Brooder*, 55 Wyo. 109, 127, 97 P.2d 311, 317-18 (1939))); 76 Am.Jur.2d, *supra*, § 138 ("[W]here an alleged trust relationship is just as consistent with that of a gift or loan, courts will ordinarily not impress a resulting trust.") (footnotes omitted); *In re Marriage of Kendra*, 815 N.E.2d 22, 25 (Ill. App. Ct. 2004) ("A resulting trust will not be found where the transaction can be construed in any other reasonable fashion.").

[¶29] In the Davis Interests' Amended Complaint, they alleged that "[a]n implied charitable trust was created when the parties entered into the MOA."  The Davis Interests alleged no conduct by the parties, other than the MOA's execution, to support their allegation that an implied trust was created.  Because the Davis Interests' sole allegation is that it was the MOA that created an implied trust, it is in the MOA that we must find the alleged intent to create a trust.  We agree with the district court that the MOA reflects no such intent.

[¶30]  At the outset, we note that by our count the MOA uses the term "gift" to describe the parties' transaction at least twenty times, and at no time does the MOA use the term

"trust." Although we understand that the language used is not controlling in our search for intent, we are at a loss to find any requirement in the MOA that would suggest that the language used was accidental or is otherwise not reflective of the parties' intent. First, while the property donors did explicitly set forth in the MOA that it was their desire to keep the ranch intact and operated as a working cattle ranch, they accomplished this objective by granting a conservation easement to The Nature Conservancy. Specifically, the MOA states:

> It is the strong desire of the donors, which is acknowledged by the Foundations, that the wishes of Courtenay C. Davis shall be carried out to the effect that the ranch will be kept intact and operated as a working cattle ranch. To that end, concurrently with the closing of the transaction to make the gift, a conservation easement will be granted to a third party possessing the qualifications under §§ 501(c)(3) and 170(h) of the Internal Revenue Code, and under any other applicable law, who will accept, hold, preserve, and protect in perpetuity all of the LLC land. It is the purpose of this easement to assure that the entire ranch property will be retained forever in its natural scenic, historic, agricultural, forested and/or open space condition and to prevent any use of the ranch that will significantly impair or interfere with the conservation values of the property. Donors intend that this easement will confine the use of the property to such activities, including, without limitation, those involving farming, ranching and education as are consistent with the purpose of this gift.

[¶31] As the district court observed, the granting of the conservation easement accomplished the donors' objectives without establishing a trust and made a trust unnecessary. Indeed, the easement is consistent with Section X of the MOA which is the section we find to be the MOA's most telling expression of the parties' intent that the entirety of the Davis Interests in the LLC and its assets were to be transferred to the University Foundations. Section X authorizes the University Foundations, "in the event that either member wishes to dissolve the joint arrangement," to, among other options, sell the ranch and other assets of the LLC, divide the proceeds, and use those proceeds to fund the MOA-defined scholarship endowments. It is clear from this provision that the donors did not intend to require the University Foundations to hold the property in trust indefinitely as a working ranch. The MOA expressly provided for sale of the property and provided for that eventuality with the granting of a conservation easement that would govern how the property would be used in the event it was no longer in possession of owners subject to the MOA.

14

[¶32] We conclude that the MOA spelled out with clarity how the conveyed property was to be used, and we find no intent that the University Foundations were to hold the property in trust. Considering this Court's longstanding approach to allegations of an intent to create a trust, that "no trust is created where the transaction is as consistent with another type of transaction as with that of a trust," we can find no occasion under these circumstances to impose a resulting trust. *See Meima*, ¶ 55, 117 P.3d at 447 n.28; *Dallas Dome Wyo. Oil Fields Co.*, 55 Wyo. at 127, 97 P.2d at 317-18.[3]

## B.   Standing

[¶33] Having concluded that the donation to the University Foundations was a gift and did not create a charitable trust, the standing question we must answer is whether the Davis Interests have standing to enforce the terms of that gift. We agree with the district court and the University Foundations that only the attorney general has standing to enforce a charitable gift.

[¶34] At common law, only the attorney general may enforce the terms of a charitable gift. *Hardt v. Vitae Found., Inc.*, 302 S.W.3d 133, 137 (Mo. Ct. App. 2009); *Carl J. Herzog Found., Inc. v. Univ. of Bridgeport*, 699 A.2d 995, 997 (Conn. 1997). The Connecticut court explained:

> At common law, a donor who has made a completed charitable contribution, whether as an absolute gift or in trust, had no standing to bring an action to enforce the terms of his or her gift or trust unless he or she had expressly reserved the right to do so. "Where property is given to a charitable corporation and it is directed by the terms of the gift to devote the property to a particular one of its purposes, it is under a duty, *enforceable at the suit of the [a]ttorney [g]eneral,* to devote the property to that purpose." (Emphasis added.) 2 Restatement (Second), Trusts § 348, comment (f), p. 212 (1959); *Attorney General v. First United Baptist Church of Lee*, 601 A.2d 96, 98 (Me.1992); *see Sarkeys v. Independent School District No. 40,* 592 P.2d 529, 533 (Okla.1979) ("[i]t has long been recognized at common law that the [a]ttorney [g]eneral has the duty of representing the public interest in securing the enforcement of charitable trusts"); *Wilbur v.*

---

[3] The district court observed that although the Davis Interests did not allege in their complaint or amended complaint that the MOA created an express trust, they did argue the statutory elements of an express trust. For the reasons discussed above, we do not find the statutory elements applicable and have not used them in our analysis. In any event, however, if an express trust had been alleged, the lack of donor intent to create a trust would have precluded finding even an express trust. *See* Wyo. Stat. Ann. § 4-10-403(a)(ii) (a trust is created only if settlor indicates an intent to create a trust).

15

*University of Vermont*, 129 Vt. 33, 44, 270 A.2d 889 (1970) (where no provision in trust instrument for forfeiture or reverter, "the remedy for a breach of trust is by suit at the instance of the [a]ttorney [g]eneral of the state to compel compliance"). At common law, it was established that "[e]quity will afford protection to a donor to a charitable corporation in that *the [a]ttorney [g]eneral may maintain a suit* to compel the property to be held for the charitable purpose for which it was given to the corporation." (Emphasis added; internal quotation marks omitted.) *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 494–95, 417 N.Y.S.2d 715 (1979). "The general rule is that charitable trusts or gifts to charitable corporations for stated purposes are [enforceable] at the instance of the [a]ttorney [g]eneral.... It matters not whether the gift is absolute or in trust or whether a technical condition is attached to the gift." (Internal quotation marks omitted.) *Id.*, at 495, 417 N.Y.S.2d 715.

"The theory underlying the power of the [a]ttorney [g]eneral to enforce gifts for a stated purpose is that a donor who attaches conditions to his gift has a right to have [h]is intention enforced." *Id.,* at 495-96, 417 N.Y.S.2d 715. The donor's right, however, is enforceable only at the instance of the attorney general; *Wier v. Howard Hughes Medical Institute*, 407 A.2d 1051, 1057 (Del.Ch. 1979) (attorney general "has the *exclusive* power to bring actions to enforce charitable trusts" [emphasis added]; *Lopez v. Medford Community Center, Inc.*, 384 Mass 163, 167, 424 N.E.2d 229 (1981) (common law rule that "it is the *exclusive* function of the [a]ttorney [g]eneral to correct abuse in the administration of a public charity by the institution of proper proceedings" [emphasis added]); and the donor himself has no standing to enforce the terms of his gift when he has not retained a specific right to control the property, such as a right of reverter, after relinquishing physical possession of it. See, e.g., *Marin Hospital District v. State Dept. of Health*, 92 Cal.App.3d 442, 448, 154 Cal.Rptr. 838 (1979) (fact that charity is bound to use contributions for purposes for which they were given does not confer to *donor* standing to bring action to enforce terms of gift). As a matter of common law, when a settlor of a trust or a donor of property to a charity fails specifically to provide for a reservation of rights in the trust or gift instrument, "'neither the donor nor his heirs have

any standing in court in a proceeding to compel the proper execution of the trust, except as relators.'" *Smith v. Thompson*, 266 Ill.App. 165, 169 (1932), quoting 2 J. Perry, Trusts and Trustees (7th Ed. 1929) § 732a, pp. 1255-56; see *Wilbur v. University of Vermont*, supra, 129 Vt. at 44, 270 A.2d 889 (breach of trust "creates no right in the donor's heirs to enforce a resulting trust"); *Hagaman v. Board of Education*, 117 N.J.Super. 446, 454, 285 A.2d 63 (1971) (heirs of settlor generally cannot enforce charitable trust). "There is no such thing as a resulting trust with respect to a charity .... Where the donor has effectually passed out of himself all interest in the fund devoted to a charity, neither he nor those claiming under him have any standing in a court of equity as to its disposition and control." (Internal quotation marks omitted.) *Smith v. Thompson,* supra, at 169; see *Wier v. Howard Hughes Medical Institute,* supra, at 1057; but see *McGee v. Vandeventer*, 326 Ill. 425, 441, 158 N.E. 127 (1927). On the basis of the weight of the foregoing authorities, we conclude that it is clear that the general rule at common law was that a donor had no standing to enforce the terms of a completed charitable gift unless the donor had expressly reserved a property interest in the gift.

*Carl J. Herzog Found.*, 699 A.2d at 997-99 (footnotes omitted) (alterations in original).

[¶35] By statute, standing to enforce an express charitable trust has been expanded in Wyoming beyond the common law rule of standing. *See* Wyo. Stat. Ann. § 4-10-406(c) (LexisNexis 2013) (specifying who may enforce express charitable trust); *see also Hicks v. Dowd*, 2007 WY 74, ¶ 28, 157 P.3d 914, 921 (Wyo. 2007) (recognizing that "a charitable trust may be enforced by a settlor, the attorney general, or a qualified beneficiary of the trust"). The same is not true of standing to enforce a charitable gift. No Wyoming statute has expanded the common law standing to enforce a charitable gift, and we agree with the majority rule that such standing should remain limited to the attorney general. *See* Iris J. Goodwin, *Donor Standing to Enforce Charitable Gifts: Civil Society vs. Donor Empowerment*, 58 Vand. L. Rev. 1093, 1145 (2005) ("To return to the particulars of the current law with respect to donor standing, nearly all the modern American authorities—decisions, model acts, statutes, and commentaries—deny a donor standing to enforce a restricted gift to public charity absent express retention of a reversion in the donative instrument.").

[¶36] The Davis Interests do not contend that they retained, through the MOA, a reversion or any other right to enforce the terms of the MOA. What the Davis Interests do contend on appeal is that because the Davis Foundation retained, under the MOA, the

17

right to appoint a member of the management committee created by the MOA, the Davis Interests have a personal stake in the enforcement of the MOA and therefore standing. We reject this contention. First, this is not an argument the Davis Interests presented to the district court, and "[t]his Court strongly adheres to a rule that it will not address issues that were not properly raised before the district court." *See In re Guardianship of Lankford*, 2013 WY 65, ¶ 28, 301 P.3d 1092, 1101 (Wyo. 2013). Moreover, the Davis Interests have not articulated how an interest arising from service on the management committee allows them to circumvent the common law rule that only the attorney general may enforce the restrictions on charitable gifts.

[¶37] The common law rule allows only the attorney general standing to bring an action to enforce the terms of a charitable gift. This remains the majority rule, and it is the rule to which we adhere in this decision. We therefore conclude that the district court properly ruled that the Davis Interests lacked standing to enforce the terms of the MOA.

## CONCLUSION

[¶38] The district court correctly concluded that the donation from the Davis Interests to the University Foundations was a gift, that the MOA did not create an implied trust, and that only the attorney general has standing to enforce the terms of a charitable gift. We thus affirm the court's dismissal of the complaint and amended complaint for lack of standing.

18